## F. W. WOOLWORTH CO. *v.* TAXATION AND REVENUE DEPARTMENT OF NEW MEXICO

No. 80–1745.   Argued April 19, 1982—Decided June 29, 1982

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring opinion, *ante*, p. 331. O'CONNOR, J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 373.

*William L. Goldman* argued the cause for appellant. With him on the briefs were *George W. Beatty, James A. Riedy, Michael D. Bray,* and *Arnold S. Anderson.*

*Sara E. Bennett,* Special Assistant Attorney General of New Mexico, argued the cause for appellee. With her on the brief were *Denise D. Fort,* Assistant Attorney General, and *Filmore E. Rose.**

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Illinois by *Tyrone Fahner,* Attorney General, *Fred H. Montgomery,* Special Assistant Attorney General, and *Lloyd B. Foster;* and for the Multistate Tax Commission et al. by *William D. Dexter; Wilson L. Condon,* Attorney General of Alaska; *J. D. MacFarlane,* Attorney General of Colorado; *Carl R. Ajello,* Attorney General of Connecticut; *Richard S. Gebelein,* Attorney

JUSTICE POWELL delivered the opinion of the Court.

The question is whether the Due Process Clause permits New Mexico to tax a portion of dividends that appellant F. W. Woolworth Co. received from foreign subsidiaries that do no business in New Mexico. We also must decide whether New Mexico may include within Woolworth's apportionable New Mexico income a sum, commonly known as "gross-up," that Woolworth calculated in order to claim a foreign tax credit on its federal income tax.

I

Woolworth's principal place of business and commercial domicile are in New York. It engages in retail business through chains of stores located in the United States, Puerto Rico, and the Virgin Islands. It sells a wide spectrum of merchandise, including dry goods, hardware, small appliances, confections, packaged goods, and fountain items. In the fiscal year ending January 31, 1977, Woolworth's gross domestic sales totalled approximately $2.5 billion, with New Mexico sales amounting to approximately $13 million—or about 0.5% of the gross figure. App. 57a.

Woolworth owns four foreign subsidiaries of relevance to this suit. Three are wholly owned: F. W. Woolworth GmbH,

General of Delaware; *David H. Leroy,* Attorney General of Idaho, and *Theodore V. Spangler, Jr.,* Deputy Attorney General; *Linley E. Pearson,* Attorney General of Indiana; *Robert T. Stephan,* Attorney General of Kansas; *Stephen H. Sachs,* Attorney General of Maryland; *Francis X. Bellotti,* Attorney General of Massachusetts; *Frank K. Kelley,* Attorney General of Michigan; *Warren R. Spannaus,* Attorney General of Minnesota; *John Ashcroft,* Attorney General of Missouri; *Paul L. Douglas,* Attorney General of Nebraska; *Gregory H. Smith,* Attorney General of New Hampshire; *Rufus L. Edmisten,* Attorney General of North Carolina, and *M. C. Banks,* Deputy Attorney General; *Robert O. Welfald,* Attorney General of North Dakota, and *Albert R. Hausauer,* Assistant Attorney General; *Dave Frohnmayer,* Attorney General of Oregon; and *David L. Wilkinson,* Attorney General of Utah.

*John J. Easton,* Attorney General of Vermont, and *Paul P. Hanlon* filed a brief for the State of Vermont as *amicus curiae.*

in Germany; F. W. Woolworth, Ltd., in Canada; and F. W. Woolworth, S. A. de C. V. Mexico. F. W. Woolworth Co., Ltd., is an English corporation of which Woolworth owns 52.7%, with the remainder held and traded publicly. These four corporations also engage in chainstore retailing.[1] Together they paid Woolworth approximately $39.9 million in dividends during the fiscal year in question.

New Mexico adopted a version of the Uniform Division of Income for Tax Purposes Act in 1965, N. M. Stat. Ann. §§ 7–4–1—7–4–21 (1981), and joined the Multistate Tax Compact in 1967. §§ 7–5–1—7–5–7 (1981). See *ASARCO Inc.* v. *Idaho State Tax Comm'n, ante,* at 311–312; *United States Steel Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452 (1978). Consequently the State distinguishes between "business" income,[2] which it apportions between it and other States for tax purposes,[3] and "nonbusiness" income,[4] which it generally

---

[1] The English subsidiary operates about 2,000 stores, App. 39a, the Canadian company about 500, *id.,* at 24a, and the Mexican about 12. *Id.,* at 28a. The record does not specify the number of stores the German company owns, but the company may be between the English and Canadian operations in size.

[2] " '[B]usiness income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations . . . ." N. M. Stat. Ann. § 7–4–2(A) (1981).

[3] "All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three." N. M. Stat. Ann. § 7–4–10 (1981).

"The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period." § 7–4–11.

"The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for com-

allocates to a single State on the basis of commercial domicile.[5] Woolworth reported its dividend income of $39.9 million from its German, Canadian, Mexican, and English subsidiaries as "nonbusiness" income, none of which was to be allocated to New Mexico. Woolworth also treated as "nonbusiness" income a $1.6 million gain from a hedging transaction in British pounds. This transaction was undertaken for the purpose of insuring the payment of the British subsidiary's dividend against currency fluctuations. See App. 52a–54a. Similarly, Woolworth did not report as New Mexico "business" income $25.5 million of "gross-up" that it never actually received but that the Federal Government (for purposes of calculating Woolworth's federal foreign tax credit pursuant to 26 U. S. C. §§ 78, 901(a), and 902(a)) *deemed* Woolworth to have received from its foreign subsidiaries.[6]

---

pensation, and the denominator of which is the total compensation paid everywhere during the tax period." § 7–4–14.

"The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in the state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." § 7–4–16.

[4] " '[N]onbusiness income' means all income other than business income." N. M. Stat. Ann. § 7–4–2(D) (1981).

[5] "Rents and royalties from real or tangible personal property, capital gains, interest, *dividends*, or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in Sections 6 through 9 [7–4–6 to 7–4–9 NMSA 1978] of the Uniform Division of Income for Tax Purposes Act." N. M. Stat. Ann. § 7–4–5 (1981) (emphasis added).

"Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state." § 7–4–8.

New Mexico defines "commercial domicile" as "the principal place from which the trade or business of the taxpayer is directed or managed." § 7–4–2(B).

[6] "If a domestic corporation chooses to have the benefits of subpart A of part III of subchapter N (relating to foreign tax credit) for any taxable year, *an amount equal to the taxes deemed to be paid by such corporation under section 902(a)* (relating to credit for corporate stockholder in foreign corporation) . . . for such taxable year *shall be treated for purposes of this*

On audit, the New Mexico Taxation and Revenue Department determined that, under state law, Woolworth should have included in its apportionable New Mexico income the dividends from its four foreign subsidiaries, the foreign exchange gain, and the $25.5 million gross-up figure. These additions increased Woolworth's apportioned New Mexico income from $84,622 to $401,518. App. 69a. The Department denied Woolworth's protest,[7] but this decision was

---

*title . . . as a dividend received* by such domestic corporation from the foreign corporation." 26 U. S. C. § 78 (emphasis added).

"If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall . . . be credited with the . . . taxes deemed to have been paid under sectio[n] 902 . . . ." § 901(a).

"For purposes of this subpart, a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income . . . taxes paid or deemed to be paid by such foreign corporation to any foreign country . . . on . . . the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends (determined without regard to section 78) bears to the amount of such accumulated profits in excess of such income . . . taxes (other than those deemed paid)." § 902(a).

Woolworth gives this example: "If a foreign subsidiary of a United States parent earns $100, pays foreign tax of $40, and pays a dividend of $30 out of its after-tax profits of $60, the deemed paid foreign tax credit of the parent under section 902(a) is 30/60 × $40, or $20. The parent includes $50 in dividend income (*i. e.*, the actual dividend of $30 plus $20 of 'gross-up') and claims a foreign tax credit of $20 against the federal income tax on this income." Brief for Appellant 6, n. 4. See 26 CFR §§ 1.78–1, 1.902–1(h), (k) (1982); S. Rep. No. 1881, 87th Cong., 2d Sess., 222–228 (1962); H. R. Rep. No. 1447, 87th Cong., 2d Sess., A79–A84 (1962); 3 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 69.2 (1981).

[7] Only one witness—Woolworth's tax manager—appeared before the Department's hearing examiner. The State introduced as evidence Woolworth's tax return, a notice of assessment, its worksheets, Woolworth's protest, and tax regulations. Woolworth introduced a one-page diagram of its corporate structure. See App. B to Brief for Appellee. The testimony given before the examiner and referred to in this opinion is uncontroverted unless otherwise noted.

The Department's decision and order did not mention Woolworth's foreign exchange gain. See App. to Juris. Statement 30a–38a.

reversed on appeal by the New Mexico Court of Appeals. *F. W. Woolworth Co.* v. *Bureau of Revenue,* 95 N. M. 542, 624 P. 2d 51 (1979).

As a matter of state law, the Court of Appeals excluded from apportionable New Mexico income Woolworth's receipt of the dividends at issue. The court stated that "[t]here is no indication that the income from Woolworth's long-standing investments [in its subsidiaries] was used either in taxpayer's unitary domestic business or in its business conducted in New Mexico . . . ." *Id.,* at 545, 624 P. 2d, at 54. With respect to the gross-up issue, the Court of Appeals said that the State's "rigid insistence" on inclusion of this amount "is a refusal to recognize an obviously fictitious income figure, made artificial by the federal reporting requirements for a specific purpose . . . ." *Id.,* at 543–544, 624 P. 2d, at 52–53. The court said that "'[g]ross-up' in fact represents income to taxpayer's foreign subsidiaries [that] is paid out in taxes to foreign governments," *id.,* at 544, 624 P. 2d, at 53, and not income in fact to the parent. The court thus likewise excluded this sum from Woolworth's apportionable New Mexico income.[8]

The New Mexico Supreme Court reversed over one dissent. 95 N. M. 519, 624 P. 2d 28 (1981). On the question whether Woolworth's receipt of dividends from its subsidiaries constituted apportionable New Mexico income, the court observed that, "[r]egrettably, it needs to be said that the State did a very poor job of inquiring into and developing the facts in this case." *Id.,* at 524, 624 P. 2d, at 33. The court nonetheless found substantial evidence to support the findings that the subsidiaries' dividend payments met the State's statutory test for inclusion in Woolworth's apportionable New Mexico income. On the constitutional issue, the court identified the "key question" after our decision in *Mobil Oil*

---

[8] The Court of Appeals did not refer to Woolworth's foreign exchange gain.

*Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S. 425 (1980), as "whether those dividends were income earned in a unitary business." 95 N. M., at 528, 624 P. 2d, at 37. The court stated:

> "The [dividend] income [from Woolworth's subsidiaries] is obviously related to the mutual activities of the parent and its affiliates. The control over the subsidiaries, the interdependence, the history of the relationships, the placing of the [dividend] money in [Woolworth's] general operating account, all point to functional integration and reveal an underlying unitary business for our purposes here." *Id.,* at 529, 624 P. 2d, at 38.

Respecting the State's inclusion of Woolworth's federal gross-up figure as apportionable state income, the court "deem[ed] it unnecessary to delve into all the intricacies of the federal laws and regulations," but found it sufficient "to say that, since Woolworth decided to use the gross-up option, the income taxes paid by Woolworth's foreign subsidiaries to foreign governments must be deemed to be received as dividends . . . ." *Id.,* at 521–522, 624 P. 2d, at 30–31. "Admittedly, the fictitious gross-up, which the state claims is 'business income' and which Woolworth deliberately acceded to, does not fit the ordinary definition of 'income' . . . ." *Id.,* at 522, 624 P. 2d, at 31. Nevertheless, the court noted that there was no claim and no lower court finding that Woolworth did not "obtain an economic benefit from the gross-up procedure here." *Id.,* at 523, 624 P. 2d, at 32. The court consequently rejected Woolworth's statutory and constitutional challenges to the State's inclusion of the federal gross-up figure in Woolworth's apportionable New Mexico business income.[9]

---

[9] The New Mexico Supreme Court also ruled that the Court of Appeals had erred in holding that it was reasonable to conclude that Woolworth had simply passed the foreign dividends through its general treasury to its stockholders, without using the dividends for Woolworth's general corpo-

## II

This case was argued in tandem with *ASARCO Inc.* v. *Idaho State Tax Comm'n, ante,* p. 307, which also involved dividends and gains from foreign subsidiaries. We have reiterated today in *ASARCO* that " '[t]he "linchpin of apportionability" for state income taxation of an interstate enterprise is the "unitary-business principle." ' " *Ante,* at 319, quoting *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 223 (1980), in turn quoting *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont, supra,* at 439.

Woolworth owns all the stock of three of its dividend payors and a 52.7% majority interest in the fourth. As a result, Woolworth (at least with respect to the three wholly owned companies) elects all of the subsidiaries' directors. It potentially has the authority to operate these companies as integrated divisions of a single unitary business. Our decision in *ASARCO* makes clear, however, that the *potential* to operate a company as part of a unitary business is not dispositive when, looking at "the 'underlying economic realities of a unitary business,' " the dividend income from the subsidiaries *in fact* is "derive[d] from 'unrelated business activity' which constitutes a 'discrete business enterprise.' " *Exxon, supra,* at 223–224, quoting *Mobil, supra,* at 441, 442, 439. See *ASARCO, ante,* at 322–323 (holding that a 52.7%-owned subsidiary is not part of its parent's unitary business).

---

rate purposes. The Supreme Court ruled that the burden of proof was on the taxpayer. Consequently, the court held, the State's reasonable inference that Woolworth had used the foreign dividends for its own corporate purposes was supportable in the absence of evidence to the contrary. 95 N. M., at 529, 624 P. 2d, at 38. The court further rejected Woolworth's claim that the apportionment formula should be adjusted if the dividend income were found to be apportionable. *Id.,* at 529–530, 624 P. 2d, at 38–39.

The dissenting justice founded his position on "agree[ment] with the analysis of the Court of Appeals." *Id.,* at 530, 624 P. 2d, at 39.

Neither the majority nor the dissenting opinion discussed Woolworth's foreign exchange gain.

## A

The State Supreme Court in important part analyzed this case under a different legal standard. After stating that the existence of a unitary business relationship was the "key question," the court proceeded to resolve this question largely by emphasizing the potentials of the relationship between Woolworth and its subsidiaries:

> "The possession of large assets by subsidiaries is a business advantage of great value to the parent; 'it may give credit which will result in more economical business methods; it may give a standing which shall facilitate purchases; it may enable the corporation to enlarge the field of its activities and in many ways give it business standing and prestige.' *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 166 . . . (1911)." 95 N. M., at 529, 624 P. 2d, at 38.

This reliance on the *Flint* case was error. *Flint* upheld a *federal* excise tax levied on corporate income.[10] The States, of course, are subject to limitations on their taxation powers that do not apply to the Federal Government. As relevant here, "the income attributed to [a] State for tax purposes must be rationally related to 'values connected with the taxing State.' *Norfolk & Western R. Co.* v. *State Tax Comm'n*, 390 U. S. 317, 325." *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 273 (1978). The state court's reasoning would trivialize this due process limitation by holding it satisfied if the income in question "adds to the riches of the corporation . . . ." *Wallace* v. *Hines*, 253 U. S. 66, 70 (1920). Income, from whatever source, always is a "business advantage" to a corporation. Our cases demand more. In particular, they specify that the proper inquiry looks to "the underlying unity or diversity of business enterprise," *Mobil, supra,* at 440,

---

[10] The tax did *not* apply to a corporation's receipt of dividends from other companies subjected to the tax. 220 U. S., at 144–145.

not to whether the nondomiciliary parent derives some economic benefit—as it virtually always will—from its ownership of stock in another corporation. See *ASARCO, ante,* at 325–329.[11]

### B

In *Mobil* we emphasized, as relevant to the right of a State to tax dividends from foreign subsidiaries, the question whether "contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale." 445 U. S., at 438. If such "factors of profitability" arising "from the operation of the business as a whole" exist and evidence the operation of a unitary business, a State can gain a justification for its tax consideration of value that has no other connection with that State. *Ibid.* We turn now to consider the extent, if any, to which these factors exist in this case.

There was little functional integration. Woolworth's subsidiaries engaged exclusively in the business of retailing—the purchase of wholesale goods for resale to final consumers. This type of business differs significantly from the "highly integrated business" of locating, processing, and marketing a resource (such as petroleum) that we previously have found to constitute a unitary business. *Exxon,* 447 U. S., at 224. See also *id.,* at 226 (describing "a unitary stream of income, of which the income derived from internal transfers of raw materials from exploration and production to refining is a part"); *Mobil,* 445 U. S., at 428. Consistent with this dis-

---

[11] The hearing examiner and the New Mexico Supreme Court also thought it significant that Woolworth had commingled its dividends with its general funds and had used them for general corporate operating purposes. See 95 N. M., at 529, 624 P. 2d, at 38; n. 9, *supra.* This analysis likewise subverts the unitary-business limitation. *All* dividend income—irrespective of whether it is generated by a "discrete business enterprise," *Mobil,* 445 U. S., at 439—would become part of a unitary business if the test were whether the corporation commingled dividends from other corporations, whether subsidiaries or not.

tinction, the evidence in this case is that *no* phase of any subsidiary's business was integrated with the parent's. With respect to "who makes the decision for seeing to the merchandise, [store] site selection, advertising and accounting control," the undisputed testimony stated that "[e]ach subsidiary performs these functions autonomously and independently of the parent company." App. 12a.[12] "Each subsidiary has a complete accounting department and a financial staff." *Id.*, at 14a. Each had its own outside counsel. App. to Juris. Statement 34a. It further appears that Woolworth engaged in no centralized purchasing, manufacturing, or warehousing of merchandise.[13] The parent had no central personnel train-

---

[12] The testimony before the Department's hearing examiner, see n. 7, *supra*, focused primarily on the English and German subsidiaries. With respect to the Mexican and Canadian subsidiaries, the evidence was confined to the following:

"Q. Now, I would like to[,] without repeating every question if I may[,] ask a summary question concerning the Canadian and the Mexican subsidiaries, we are talking about decisions concerning merchandise mix, site selection, advertising, accounting, training of personnel, and of those items[,] would you say that there is a similarity between the relationship of the U. S. parent to Canada as there is to the German and the English subsidiaries to the extent to which these things are decentralized?

"A. Yes, there is a distinct similarity or philosophy involved in the ownership of these companies." App. 18a.

The State did not undertake to controvert the implications of this statement, and neither of the courts below found any difference in the relationships between the parent and each of the four subsidiaries. We thus must assume that the relationship between the parent and the Mexican and Canadian subsidiaries paralleled that between the parent and the English and German subsidiaries in material respects.

[13] The New Mexico Supreme Court did state that "[t]here is some flow back and forth of goods" between the parent and the subsidiaries. 95 N. M., at 524, 624 P. 2d, at 33. It cited no evidence in support of this statement. Neither the Department's hearing examiner nor the Court of Appeals made such a finding. The testimony in the record was that there were not "any inter-company sales of inventory." App. 13a.

The Woolworth witness also stated that, with respect to certain types of goods manufactured by other of the parent's subsidiaries, he lacked actual knowledge of whether there were intercompany sales. He continued that

ing school for its foreign subsidiaries. *Ibid.* And each subsidiary was responsible for obtaining its own financing from sources other than the parent.[14] In sum, the record is persuasive that Woolworth's operations were not functionally integrated with its subsidiaries.

We now consider the extent to which there was centralization of management or achievement of other economies of scale. It appears that each subsidiary operated as a distinct business enterprise at the level of fulltime management. With one possible exception,[15] none of the subsidiaries' officers during the year in question was a current or former employee of the parent. *Ibid.* The testimony was that the subsidiaries "figure that their operations are independent, autonomous." App. 13a. Woolworth did not "rotate per-

---

the idea was "inconceivable to me because of the autonomous operation of the company and the lack of coordination and other facets." *Id.,* at 43a. Upon further questioning, the witness conceded that he did not "really know where [the English subsidiary's managers] buy their merchandise." But he affirmed his knowledge that the English company's sales to and purchases from the parent were "virtually nil." *Id.,* at 44a. When questioned whether Woolworth utilized a central buying office for it and its subsidiaries, the witness replied that it did not. *Id.,* at 14a. No other evidence indicated that the parent and the subsidiaries engaged in any joint manufacturing, purchasing, or warehousing functions. Nor did the New Mexico courts find otherwise.

[14] Woolworth had no outstanding debts from its English subsidiary, App. to Juris. Statement 35a, and it had not reinvested its dividends in that company. App. 51a. The parent had reinvested dividends in the German company, *id.,* at 52a, but the last additional capital contribution by the parent that the witness could recall, *id.,* at 46a, was a $400,000 transfer made after the German company was demolished during World War II. *Id.,* at 30a. See App. to Juris. Statement 35a.

[15] The hearing examiner found that "[i]n the taxable year involved, none of the four subsidiarie[s'] officers were currently or formerly employees of the parent." *Id.,* at 34a. Without explanation, he also later stated that "[a]t least one officer of the Canadian subsidiary [was] also an officer of the [parent]." *Ibid.*

One officer from the Mexican subsidiary was a participant in Woolworth's profit-sharing plan. Woolworth paid the employee's share of this plan. *Ibid.*

sonnel or train personnel to operate stores in those countries. There is no exchange of personnel." *Ibid.* There was no "training program that is central to transmit the Woolworth idea of merchandising[,] such as it may be[,] to the foreign subsidiaries." *Id.*, at 15a. The subsidiaries "proceed . . . with their own programs, either formal or informal. They develop their own managers and instruct them in their methods of operation." *Ibid.*

This management decentralization was reflected in the fact that each subsidiary possessed autonomy to determine its own policies respecting its primary activity—retailing. According to the hearing examiner:

> "Each of the four subsidiaries are responsible for determining the size and location of retail stores, the market conditions in their own territory and the mix of items to be sold. The German subsidiary emphasizes soft goods such as dresses and coats. It sells no food. The English subsidiary operates restaurants in its stores and also operates supermarkets. Each subsidiary attempts to cater to local tastes and needs. The inventory of each subsidiary consists, in large part, of home country produced items. This purchase-at-home practice is consistent with the policy of the taxpayer. A number of inventory items are purchased from the Orient or other places but there is no evidence that the subsidiaries purchase, or are required to purchase, inventory items from any particular source." App. to Juris. Statement 33a–34a.

Importantly, the Department's hearing examiner found that Woolworth had "no department or section, as such, devoted to overseeing the foreign subsidiary operations." *Id.*, at 34a.[16] Neither the parent corporation nor any of the subsid-

_____

[16] Woolworth had one vice president "who is the liaison man with the smaller foreign subsidiaries," *ibid.*, such as the Spanish and Mexican subsidiaries. App. 50a. The testimony was that this liaison man "from time to time . . . may have contact with the major subsidiaries . . . ." *Ibid.*

iaries consolidates its tax return with any of the other companies. App. 37a–38a. The tax manager for Woolworth stated that he did not review the subsidiaries' tax returns or consult with them on decisions affecting taxes. *Id.*, at 14a. There was no "policy of the parent that all of the managers of all the operations get together periodically to discuss the overall Woolworth operations." *Id.*, at 35a.[17]

There were some managerial links. Woolworth maintained one or several common directors with some of the subsidiaries.[18] There also was irregular in-person[19] and "frequent" mail, telephone, and teletype communication between the upper echelons of management of the parent and the subsidiaries.[20] App. to Juris. Statement 34a. Decisions about

---

[17] The witness replied that "[t]here hasn't been that" in response to the questions of whether "all of the managers of all of the operations" ever "get together and talk together about where the company is going or what it is doing or where it should be tomorrow or in ten years from today? Planning for future programs or for future expansion?" *Id.*, at 35a.

[18] The managing director of the English subsidiary sat as one of the parent's 15 directors, and the parent sent one of its officers to participate in meetings of the English board of directors. The state hearing examiner also found that "[a]t least one person who is on the Canadian subsidiary is also on the taxpayer's board." App. to Juris. Statement 34a. Cf. App. 41a (at least *three* members of the Canadian board of directors also sat on the parent's board). Although the Department's hearing examiner did not make findings in this connection, there was testimony that "some of the directors of Woolworth, the taxpayer, sit on the Board of the Mexican subsidiary . . . ." *Id.*, at 29a.

[19] "It would be on a rare occasion, once a year," that the "managing directors" of the foreign subsidiaries would come to New York. *Id.*, at 34a. "It is only sporadically that the parent company is represented at the [English company's] Board meetings." *Id.*, at 40a. Further, while Woolworth's chief executive officer and other officers would "on occasion" travel to confer with the subsidiaries' managers, it was "hard to discern any pattern of regular monthly visits or quarterly visits." *Id.*, at 35a.

[20] "The exchange of information contacts by the subsidiaries is made by the Chief Executive of the company. The Director of Purchases of the parent company does not confer with the Director of Purchasing of the Canadian company or of the German company." *Id.*, at 37a.

major financial decisions, such as the amount of dividends to be paid by the subsidiaries and the creation of substantial debt, had to be approved by the parent.[21]  *Id.*, at 35a. Woolworth's published financial statements, such as its annual reports, were prepared on a consolidated basis.[22]  *Ibid.*

We conclude, on the basis of undisputed facts, that the four subsidiaries in question are not a part of a unitary business under the principles articulated in *Mobil* and *Exxon*, and today reiterated in *ASARCO.*  Except for the type of occasional oversight—with respect to capital structure, major debt, and dividends—that any parent gives to an investment in a subsidiary, there is little or no integration of the business activities or centralization of the management of these five corporations.  Woolworth has proved that its situation dif-

---

[21] The testimony was that "the Canadian financial people have the right to finance their day-to-day operations and I doubt that they would be required . . . at the level of a million dollars to seek the permission of the parent company.  If there was really substantial borrowings going on, I am sure the Canadians before borrowing . . . would obtain permission of the parent company."  *Id.*, at 26a.  More generally, the witness stated that "[n]ormally, I would think that substantial borrowing, an unusual amount, would necessitate the checking with the principal stockholders or the Board of Directors."  *Id.*, at 28a.

[22] The English subsidiary was not included in the consolidated statements.  App. to Juris. Statement 35a.  Cf. Keesling & Warren, The Unitary Concept in the Allocation of Income, 12 Hastings L. J. 42, 52 (1960) ("Central accounting, for instance, may result in some savings, but in most instances the amount is trifling in comparison with the income [involved]. Alone considered, it is too weak a connecting link to bind into one business, what would otherwise, from an operational standpoint, be considered separate businesses").

As noted, there was no centralized tax department and no consolidation of tax returns.

In addition to the links set forth in the text, it is plain that the parent and the four subsidiaries all utilize the same general "F. W. Woolworth" corporate name.  There is no record information on the significance of the use of this common name.  Neither the Department nor the New Mexico Supreme Court gave any weight to use of a common corporate name when sustaining the tax at issue.

fers from that in *Exxon,* where the corporation's Coordination and Services Management office was found to provide for the asserted unitary business

> "long-range planning for the company, maximization of overall company operations, development of financial policy and procedures, financing of corporate activities, maintenance of the accounting system, legal advice, public relations, labor relations, purchase and sale of raw crude oil and raw materials, and coordination between the refining and other operating functions 'so as to obtain an optimum short range operating program.'" 447 U. S., at 211.

In this case the parent company's operations are not interrelated with those of its subsidiaries so that one's "stable" operation is important to the other's "full utilization" of capacity. *Id.,* at 218. See also *id.,* at 225. The Woolworth parent did not provide "many essential corporate services" for the subsidiaries, and there was no "centralized purchasing office . . . whose obvious purpose was to increase overall corporate profits through bulk purchases and efficient allocation of supplies among retailers." *Id.,* at 224.[23] And it was not the case that "sales were facilitated through the use of a uniform credit card system, uniform packaging, brand names, and promotional displays, all run from the national headquarters." *Ibid.* See also *Mobil,* 445 U. S., at 428, 435.[24]

---

[23] Cf. *Butler Bros.* v. *McColgan,* 315 U. S. 501, 508 (1942).

[24] In *Mobil,* the Court relied upon *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271 (1924):

"A British corporation manufactured ale in Great Britain and sold some of it in New York. The corporation objected on due process grounds to New York's imposition of an apportioned franchise tax on the corporation's net income. The Court sustained the tax on the strength of its earlier decision in *Underwood Typewriter Co.* v. *Chamberlain,* [254 U. S. 113 (1920)], where it had upheld a similar tax as applied to a business operating in several of our States. It ruled that the brewer carried on a unitary business, involving 'a series of transactions beginning with the manufacture in Eng-

There is a critical distinction between a retail merchandising business as conducted by Woolworth and the type of multinational business—now so familiar—in which refined, processed, or manufactured products (or parts thereof) may be produced in one or more countries and marketed in various countries, often worldwide.[25]   In operations of this character there is a flow of international trade, often an interchange of personnel, and substantial mutual interdependence.   The uncontradicted evidence demonstrates that Woolworth's international retail business is not comparable.   There is no flow of international business.   Nor is there any integration or unitary operation in the sense in which our cases consistently have used these terms.

In *Mobil*, we recognized:

> "[A]ll dividend income received by corporations operating in interstate commerce is [not] necessarily taxable in each State where that corporation does business. Where the business activities of the dividend payor have nothing to do with the activities of the recipient *in the taxing State*, due process considerations might well preclude apportionability, because there would be no underlying unitary business." *Id.*, at 441–442.

---

land and ending in sales in New York and other places'. . . . 266 U. S., at 282." *Mobil*, 445 U. S., at 438.

There is no comparable "series of transactions" in this case linking the retail merchandise business of Woolworth's foreign subsidiaries with its business in New Mexico.

[25] See *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell*, 283 U. S. 123, 133 (1931) ("Undoubtedly, the enterprise of a corporation which manufactures and sells its manufactured product is ordinarily a unitary business, and all the factors in that enterprise are essential to the realization of profits"); Hellerstein, Recent Developments in State Tax Apportionment and the Circumscription of Unitary Business, 21 Nat. Tax J. 487, 496 (1968) ("Manufacturing or purchasing goods in one state and selling in another, and transportation and communication between the states are typical of cases considered unitary"); G. Altman & F. Keesling, Allocation of Income in State Taxation 101–102 (1946).

This is such a case. Each of the foreign subsidiaries at issue operates a "discrete business enterprise," *Mobil, supra,* at 439, with a notable absence of any "umbrella of centralized management and controlled interaction." *Exxon,* 447 U. S., at 224. New Mexico, in taxing a portion of dividends received from such enterprises, is attempting to reach "extraterritorial values," *Mobil, supra,* at 442, wholly unrelated to the business of the Woolworth stores in New Mexico. As a result, a "showing has been made that income unconnected with the unitary business has been used in the" levy of the New Mexico tax. *Butler Bros.* v. *McColgan,* 315 U. S. 501, 509 (1942). We conclude that this tax does not bear the necessary relationship " 'to opportunities, benefits, or protection conferred or afforded by the taxing State. See *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444.' " *Norfolk & Western R. Co.* v. *Missouri State Tax Comm'n,* 390 U. S. 317, 325, n. 5 (1968), quoting *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S. 169, 174 (1949). New Mexico's tax thus fails to meet established due process standards.

## III

We need not be detained by New Mexico's reaching out to tax "gross-up" amounts that even the Supreme Court of New Mexico recognized as "fictitious." 95 N. M., at 522, 624 P. 2d, at 31. The gross-up computation is a figure that the Federal Government "deems" Woolworth to have received for purposes of part of Woolworth's federal foreign tax credit calculation. It "is treated [for this purpose] as a dividend in the same manner as a dividend actually received by the domestic corporation from a foreign corporation." H. R. Rep. No. 1447, 87th Cong., 2d Sess., A83 (1962). See also S. Rep. No. 1881, 87th Cong., 2d Sess., 227 (1962). In this case the foreign tax credit arose from the taxation by foreign nations of Woolworth foreign subsidiaries that had no unitary business relationship with New Mexico. New Mexico's effort to

tax this income "deemed received"—with respect to which New Mexico contributed nothing—also must be held to contravene the Due Process Clause.[26]

## IV

The judgment of the Supreme Court of New Mexico is reversed.

*It is so ordered.*

[For concurring opinion of THE CHIEF JUSTICE, see *ante*, p. 331.]

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN and JUSTICE REHNQUIST join, dissenting.

The $39.9 million in dividend income at issue in this case was earned by four foreign subsidiaries of F. W. Woolworth Co.: F. W. Woolworth GmbH (Germany), F. W. Woolworth, Ltd. (Canada), F. W. Woolworth, S. A. de C. V. Mexico (Mexico), and F. W. Woolworth Co., Ltd. (England). F. W. Woolworth Co. wholly owned its German, Canadian, and Mexican subsidiaries, and had a 52.7% interest in its English subsidiary. During the tax year in question the subsidiaries apparently operated somewhat autonomously in their respective markets, but "mail, telephone, and teletype communication between the upper echelons of management of the parent and the subsidiaries" was "'frequent.'" *Ante*, at 368 (footnote omitted) (quoting App. to Juris. Statement 34a). Moreover, "[d]ecisions about major financial decisions, such as the amount of dividends to be paid by the subsidiaries and the creation of substantial debt, had to be approved by the

---

[26] Woolworth challenges only New Mexico's tax treatment of its dividend and gross-up income. See Juris. Statement i; Brief for Appellant i. We therefore do not consider New Mexico's tax treatment of other items of Woolworth income. In particular, we do not pass upon the proper treatment of Woolworth's foreign exchange gain—a matter that was not considered below. See nn. 7–9, *supra*.

parent," and "Woolworth's published financial statements, such as its annual reports, were prepared on a consolidated basis." *Ante,* at 368–369 (citations and footnotes omitted).

These controlled subsidiaries, operating in geographically diverse markets in the same line of business as F. W. Woolworth itself, were simply not "unrelated,"[1] "discrete business enterprise[s],"[2] "hav[ing] nothing to do with the activities"[3] of F. W. Woolworth in New Mexico. Because I disagree with the redefinition of the limits of a unitary business adopted today by the Court, and for the reasons expressed in my dissent in No. 80–2015, *ASARCO Inc.* v. *Idaho State Tax Comm'n, ante,* p. 331, which was argued in tandem with this case, I respectfully dissent.

---

[1] *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S. 425, 439 (1980).

[2] *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 224 (1980).

[3] *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont, supra,* at 442.