**SUPER VALU STORES, INC., Appellant,**

v.

**IOWA DEPARTMENT OF REVENUE AND FINANCE, Appellee.**

No. 90–1557.

Supreme Court of Iowa.

Dec. 24, 1991.

John W. Windhorst, Jr. and Mary J. Streitz of Dorsey & Whitney, Minneapolis, Minnesota, and Jeffrey E. Lamson of Belin, Harris, Helmick, Lamson & McCormick, P.A., for appellant.

Bonnie J. Campbell, Atty. Gen., Harry M. Griger, Sp. Asst. Atty. Gen., and James D. Miller, Asst. Atty. Gen., for appellee.

Considered by McGIVERIN, C.J., and LARSON, NEUMAN, SNELL, and ANDREASEN, JJ.

LARSON, Justice.

When Super Valu Stores, Inc. sold a subsidiary corporation, County Seat Stores, Inc., the State of Iowa attempted to subject the capital gain to Iowa income tax. Super Valu resisted on the ground that, while Super Valu itself was subject to Iowa in-

come tax, County Seat and Super Valu were not a "unitary business" for tax purposes, and Super Valu's gain on the sale of County Seat could not be attributed to Super Valu's Iowa income. The department of revenue and finance, and the district court, rejected this argument. We affirm.

Super Valu is a corporation organized under Delaware law with its principal place of business and commercial domicile in Minnesota. In 1984 it sold all of its stock in County Seat, a wholly owned subsidiary, and realized a long-term capital gain of $41,067,700. On its Iowa income tax return, Super Valu allocated the entire gain to its Minnesota income as a nonbusiness capital gain (thus not subject to Iowa income tax). *See* Iowa Code § 422.33(2)(a)(4) (1989); 701 Iowa Admin.Code 54.4(422).

The department of revenue and finance disagreed with Super Valu's treatment of the gain and classified a portion of it as business income subject to apportionment under Iowa Code section 422.33(2)(b) and Iowa Administrative Code section 701–54.-2(422). The department assessed an additional tax of $395,597.23. In the contested case proceeding that followed, the department confirmed the assessment. Super Valu petitioned for judicial review under Iowa Code sections 17A.19 and 422.29, and the district court affirmed.

Super Valu sells food and related products at wholesale to independently owned supermarkets in approximately twenty-eight states and owns several retail stores. It also owned twenty-six subsidiaries during the tax year in question, twenty-four of which were engaged in the wholesale food business or in providing services to the food business. County Seat, and one other subsidiary, ShopKo Stores, Inc., were not engaged in the wholesale food business or activities ancillary to the food business.

Jack Crocker, a Super Valu employee, conceived the idea of entering the clothing business. As a result, County Seat was established in 1973 as a separate division of Super Valu. William S. Bailey was hired as manager.

County Seat was involved in the retail clothing business, usually operating in leased premises in shopping malls. County Seat initially featured Levi Strauss clothing but eventually added sport shoes and fashion clothing.

County Seat's business grew rapidly. By 1976 it had eighty stores, and an additional sixty were planned for the following year. In 1976, Super Valu established County Seat as a separate corporation and transferred to it all of the County Seat assets in exchange for stock and debt. Super Valu also assigned to County Seat all outstanding County Seat contracts, and County Seat assumed all obligations under them. The initial directors of the new County Seat corporation were Jack Crocker, Chairman of the Board of Super Valu, William S. Bailey, and James L. Slovick (who was vice president and treasurer of Super Valu). County Seat's directors elected Bailey as president.

County Seat and Super Valu had separate organizational structures; however, several key personnel had positions in both corporations. County Seat's three directors and five of its twelve officers at the time of its incorporation were also directors and officers of Super Valu. None of the common directors or officers, however, was active in the day-to-day management of both Super Valu and County Seat. Bailey, who was a director and officer of both corporations, was involved only in the day-to-day management of County Seat.

The remaining two County Seat directors holding positions in both corporations, Crocker and Michael W. Wright, President and Chief Executive Officer of Super Valu, were not involved in the day-to-day management of County Seat. The other four officers with positions in both corporations performed no services for County Seat other than the occasional execution of financial and legal documents, such as tax returns, and they were compensated only by Super Valu. In addition to its own president, County Seat had several of its own vice presidents in charge of various aspects of its business. While two of these County Seat officers had previously been nonofficer employees of Super Valu, none

of them had ever worked in Super Valu's food business.

County Seat did not share any brand names, logos, or other indicia of identification with Super Valu, nor were any of the inventories of the two corporations similar. County Seat had its own personnel department and its own personnel policies and procedures. There were few transfers of employees between Super Valu and County Seat, although County Seat participated with Super Valu and its other subsidiaries in common retirement and employee stock ownership plans.

County Seat and Super Valu maintained their respective home offices at the same location. County Seat was charged an intercorporate fee for the cost of the office facilities occupied by it. Super Valu charged County Seat a portion of Super Valu's interest and expense attributed to the construction of the common facilities.

Super Valu contends that it exercised very little oversight of the operation of County Seat, and except that County Seat's capital and operating budgets were approved by Super Valu's board of directors, Super Valu did not conduct any formal oversight of County Seat or involve itself in any of County Seat's major business decisions. Super Valu concedes that its role in the budgeting process, however, affected the number of new County Seat stores that could be opened.

County Seat and Super Valu shared the services of several Super Valu departments, including cash management services, payroll, insurance services, legal services, tax preparation, auditing procedures, and corporate tax preparation. The costs of shared services were allocated among Super Valu and its other subsidiaries, including County Seat. Divisions of Super Valu provided architectural, engineering, and store design services for County Seat, which paid Super Valu for them.

Super Valu borrowed from outside sources the funds necessary to meet the needs of its subsidiaries, including County Seat. The borrowed funds were furnished to the subsidiaries, which then became indebted to Super Valu. Super Valu guaranteed some of County Seat's retail store leases on the request of the store owners, but Super Valu was never required to perform on any of these obligations.

The director of revenue found that County Seat was "totally dependent" on Super Valu for its initial financing and subsequent expansions; however, Super Valu contends that these findings were not supported by substantial evidence. It contends that Super Valu used resources available to it to establish the County Seat business as a division of Super Valu in 1973 but that it was not totally responsible for furnishing the $22,900,000 in resources required to incorporate County Seat in 1976. In fact, Super Valu argues, County Seat had been operating for three years prior to the incorporation and furnished part, although it does not specify how much, of the $22,900,000 required for the incorporation. It does point out that County Seat's net operating earnings through its 1976 fiscal year were $8.2 million and $26.7 million through the fiscal year ending in 1977, which included the year of the incorporation.

While the extent of Super Valu's involvement in the financial affairs of County Seat was substantial, Super Valu contends it was not sufficient to constitute a unitary business relationship for tax purposes. It relies primarily on the dissimilarity of the businesses of Super Valu and County Seat and the lack of day-to-day control by Super Valu.

Under Iowa Code section 422.33, a tax is imposed on a corporation's "net income" as defined in section 422.35. If a taxpayer conducts business both within and without the State of Iowa, only that portion of its net income reasonably attributed to its income-producing activities in Iowa may be taxed. *American Home Prods. Corp. v. Iowa State Bd. of Tax Review*, 302 N.W.2d 140, 144 (Iowa 1981). Super Valu and the department agree that the pivotal issue in this case may be simply stated: whether Super Valu and County Seat were "unitary" businesses as that term is applied in tax cases. If they are unitary, the capital gain on Super Valu's sale of County

Seat is includable in part in Super Valu's Iowa income. If the businesses are not unitary, any gain on the sale would be included in Super Valu's return in the state of its domicile, Minnesota. The burden of establishing exclusion of income is on the taxpayer. *Richards v. Iowa Dep't of Revenue,* 360 N.W.2d 830, 831 (Iowa 1985) (assessment of income tax presumed to be correct; taxpayer has burden of proof of error).

■ Under the due process and commerce clauses of the United States Constitution, a state may not impose an income-based tax on "value earned outside its borders." *Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159, 164, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 552 (1983); *ASARCO, Inc. v. Idaho State Tax Comm'n,* 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982). The Supreme Court, however, has noted the difficulty in arriving at precise territorial allocations of value in integrated business enterprises. *Container Corp.,* 463 U.S. at 164, 103 S.Ct. at 2939, 77 L.Ed.2d at 552.

■ Under the Supreme Court test, a finding of a unitary relationship between business entities will be affirmed if such finding is "within the realm of permissible judgment." *Container Corp.,* 463 U.S. at 180, 103 S.Ct. at 2948, 77 L.Ed.2d at 560. While our cases have not adopted such a test, we give deference to agencies in our review of their official actions. Judicial review of the action of the department of revenue is governed by our Administrative Procedure Act, Iowa Code §§ 17A.19(8), 422.55. *Nymann v. Department of Revenue & Fin.,* 465 N.W.2d 890, 891 (Iowa 1991).

■ Findings of fact by the agency are sufficient if they are supported by substantial evidence under the record as a whole. Iowa Code § 17A.19(8)(f); *Polk County v. Civil Rights Comm'n,* 468 N.W.2d 811, 815 (Iowa 1991); *Nymann,* 465 N.W.2d at 891.

We give weight to an agency's construction of a statute, although we are not bound by it. *Polk County v. Iowa Nat'l Resources Council,* 377 N.W.2d 236, 239 (Iowa 1985); *Woodbine Community Sch. Dist. v. Public Employment Relations Bd.,* 316 N.W.2d 862, 864 (Iowa 1982). We also give some weight to the department's interpretation and application of Supreme Court cases applying the unitary business concept although, again, we are not bound by it.

As *Container Corp.* noted, a state may constitutionally respect formal corporate lines and treat the ownership of a corporate subsidiary as per se a passive investment, thus not a component of a "unitary" business. *Id.* 463 U.S. at 167–68, 103 S.Ct. at 2941, 77 L.Ed.2d at 555. As the Court has noted, however, it is difficult to determine the income of a multistate taxpayer based on geographical or "transactional accounting." The problem is that "formal accounting is subject to manipulation and imprecision, and often ignores or captures inadequately the many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise." *Id.* at 164–65, 103 S.Ct. at 2940, 77 L.Ed.2d at 553. Hence, the need for the "unitary business" concept.

> The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction.

*Id.* at 165, 103 S.Ct. at 2940, 77 L.Ed.2d at 553.

*Container Corp.* recognized that the unitary business concept is not limited to vertically integrated businesses but may also include enterprises owned separately in different jurisdictions if they are linked together by common managerial or opera-

tional resources that produce "economies of scale and transfers of value." *Container Corp.*, 463 U.S. at 166, 103 S.Ct. at 2941, 77 L.Ed.2d at 554 (citing *Butler Bros. v. McColgan*, 315 U.S. 501, 507, 62 S.Ct. 701, 704, 86 L.Ed. 991, 996 (1942)).

*Container Corp.* also held that a substantial flow of goods between the two business entities need not be established to constitute a unitary business, concluding that "[t]he prerequisite to a constitutionally acceptable finding of unitary business is a flow of *value*, not a flow of goods." *Container Corp.*, 463 U.S. at 178, 103 S.Ct. at 2947, 77 L.Ed.2d at 561.

> [A] relevant question in the unitary business inquiry is whether " 'contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale.' "

*Container Corp.*, 463 U.S. at 179, 103 S.Ct. at 2947, 77 L.Ed.2d at 562 (quoting *F.W. Woolworth Co. v. Taxation & Revenue Dep't*, 458 U.S. 354, 364, 102 S.Ct. 3128, 3135, 73 L.Ed.2d 819, 827–28 (1982), quoting in turn, *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 438, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510, 521 (1980)). While a substantial flow of goods is one factor to be considered, it is not the only one. *Container Corp.*, 463 U.S. at 179, 103 S.Ct. at 2947, 77 L.Ed.2d at 562.

There is substantial support for the department's conclusion that the Super Valu–County Seat relationship met the test for a unitary business. While day-to-day control of County Seat was not actually exercised by Super Valu, the power to do so was present. The directors of County Seat were also members of Super Valu's board of directors, Super Valu employees, or both. The original president of County Seat, William S. Bailey, was hired by Super Valu and later became a vice president of Super Valu, after serving as president of County Seat and a member of the board. Jack J. Crocker, former President and Chief Executive Officer of Super Valu, was a member of the board of directors of Super Valu, as well as a member of the

board of directors of County Seat, until the time of County Seat's sale. James L. Slovick, Vice President and Treasurer of Super Valu, was also a member of the board of County Seat.

At the time County Seat was sold, its twelve officers included five executive officers of Super Valu. William S. Bailey, Vice President of Super Valu, was president of County Seat. C.D. Dugan, Vice President and Legal Secretary of Super Valu, was the Vice President and Secretary of County Seat. R.O. Erickson, Vice President for Market Development with Super Valu, was Treasurer of County Seat. J.B. Ferris, Senior Vice President of Super Valu, was Vice President and Assistant Treasurer of County Seat. William C. Hunt, Assistant Secretary of Super Valu was also Assistant Secretary of County Seat.

Super Valu's chief executive officer had the authority to hire and fire the president of County Seat, and the board of directors of Super Valu fixed the compensation of County Seat's president.

Life and disability insurance for County Seat employees was purchased by Super Valu for Super Valu's own employees, as well as its subsidiaries, including County Seat. County Seat employees also participated in a common retirement plan and employee stock ownership plan developed by Super Valu.

Super Valu conducted an annual review and approval of County Seat's operating and capital budgets that bore directly on the number of new stores that County Seat could open. Super Valu performed payroll processing and audit services for County Seat and filed the tax returns required of County Seat. Super Valu had a centralized cash concentration system that handled all cash management for Super Valu and its other subsidiaries, including County Seat. Income of all subsidiaries, and Super Valu, was pooled in the system and used for the payment of expenses incurred by Super Valu and its subsidiaries.

The initial financing of County Seat was totally provided by Super Valu. A promissory note from County Seat to Super Valu

for $22,900,343, representing a seven-year indebtedness was not paid within the time provided by the note. Yet, during the period of the note, County Seat expanded from eighty to 269 stores. A reasonable conclusion is that County Seat's success was a direct result of this financial nurturing by Super Valu.

■ Short-term borrowing and short-term investment decisions to provide working capital for the subsidiaries, including County Seat, was provided by Super Valu, which, as previously noted, borrowed money on behalf of County Seat. We believe there is evidence to establish that County Seat was largely dependent on Super Valu for its continued financing, although it probably could have existed financially on its own.

We conclude that the Super Valu–County Seat relationship produced the "economies of scale and transfers of value" inherent in a unitary business for tax purposes, *Container Corp.*, 463 U.S. at 166, 103 S.Ct. at 2941, 77 L.Ed.2d at 554. A portion of Super Valu's gain on its sale of County Seat was therefore properly submitted to Iowa's income tax. Accordingly, we affirm.

AFFIRMED.