## CIRCUIT COURT OF FAIRFAX COUNTY

General Motors Corp.

v.

Virginia Dept. of Taxation

April 8, 2003

Case No. L192277

BY JUDGE DENNIS J. SMITH

This matter came before the Court on the following issues: (1) whether the Virginia Department of Taxation ("the Department") properly assessed an additional five percent interest above the federal short-term rate by applying 26 U.S.C. § 6621(c) to the underpayment rate established under 26 U.S.C. § 6621(a)(2); (2) whether General Motors ("G.M.") may exclude from taxable income subject to the apportionment part of its interest income from investment of cash; and (3) whether the reference to "cost of performance" in Virginia Code § 58.1-418 was properly interpreted by Virginia Regulation 23 VAC 10-120-250 (formerly VR 630-3-418), which was applied by the Department, to exclude the cost of activities performed by G.M.'s independent contractors. The parties entered into numerous stipulations, evidence was presented, and the matter argued. The Court ruled as to the first issue, but took the remaining two issues under advisement. The parties then returned to Court for the ruling, which was delivered orally. Upon the request of the parties,

however, the Court has reduced its findings (other than the stipulated facts) and rulings to writing. For the sake of completeness, the Court has also set forth its ruling on the first issue.

### I. *Application of 26 U.S.C. § 6621(c)* *to Virginia Interest Rate for Corporate Underpayment*

Va. Code § 58.1-15 states as follows:

> A. Unless otherwise specifically provided, interest on omitted taxes, assessments, and refunds under this title shall be computed at the rates equal to the rates of interest established pursuant to § 6621 of the Internal Revenue Code. The rate of interest on omitted taxes and assessments under this title shall be the "Underpayment Rate" established pursuant to § 6621(a)(2) of the Internal Revenue Code plus two percent. The rate of interest on refunds under this title shall be the "Overpayment Rate" for noncorporate taxpayers established pursuant to § 6621(a)(1) of the Internal Revenue Code plus two percent. Separate computations shall be made by multiplying the deficiency or overpayment for each period by the rate of interest applicable to that period.

26 U.S.C. § 6621(a)(2) provides that the "overpayment rate established under this section shall be the sum of ... the federal short-term rate determined under subsection (b), plus 3 percentage points." The Department interpreted Virginia Code § 58.1-15 to incorporate 26 U.S.C § 6621(c), establishing a five percent addition to the federal short-term rate for large corporate underpayments (exceeding $100,000). The Department reasoned that since 26 U.S.C. § 6621(a)(2) refers to the "underpayment rate *established by this section*," it necessarily requires reference to the entirety of the section, including the large corporate underpayment rate set forth in subsection (c)(2).

The question before the Court, however, deals with the definition of the Virginia underpayment rate, not the federal underpayment rate. Virginia Code § 58.1-15 establishes the definition of "underpayment rate" for Virginia taxation, and it specifically refers to section 6621(a)(2), a subsection of section 6621. The Department also asserts that the first sentence of § 58.1-15(A) does

state that interest on omitted taxes "shall be computed at the rates equal to the rates of interest established pursuant to § 6621 of the Internal Revenue Code. . .." indicating an intent on the part of the General Assembly to incorporate the entirety of section 6621. At best, however, this poses a conflict within the statute. By rules of statutory construction such a conflict should be harmonized by the specific governing the general. As the Virginia Supreme Court has stated, "According to the maxim *noscitur a sociis* ... when general and specific words are grouped, the general words are limited by the specific and will be construed to embrace only objects similar in nature to those things identified by the specific words." *Martin v. Commonwealth*, 224 Va. 298, 302, 295 S.E.2d 890 (1982), as quoted in *Cape Henry v. National Gypsum*, 229 Va. 596, 603, 331 S.E.2d 476 (1985). *See also Virginia Nat'l Bank v. Harris*, 220 Va. 336, 257 S.E.2d 867 (1979).

Accordingly, the Court ruled on the day of the hearing that § 58.1-15 was clear and unambiguous, and it did not incorporate the federal interest rate applicable to large corporate underpayments set forth in 26 U.S.C. § 6621(c).

## II. *Exclusion of Interest Income from Statutorily Defined Taxable Income*

During deliberations, this Court first examined the issue of whether the Department properly taxed interest earned from investment income of G.M., a foreign corporation. G.M. argued that "interest generated by investments made from a taxpayer's excess cash is not subject to state tax where the investment activities occur outside of the state." G.M. Trial Br. at 8. The portion of interest income excluded from the Virginia apportionable income originated from investment funds, which, unlike capital funds, are not subject to taxation. *Id.* Finally, given that part of the interest income was derived from investment funds, Virginia is not permitted to tax the entirety of the interest income as it was earned outside of the Commonwealth of Virginia. *Id.* at 10.

The Department opposed G.M.'s assertions by arguing that G.M.'s centralized account, known as the New York Treasury Office ("NYTO"), held substantial liquid assets that were working capital of the business and therefore subject to taxation. (The Department's Trial Br. at 8.) The Department further correctly asserts that G.M. has the burden to prove by clear and convincing evidence that the interest income, or any part thereof, was in fact derived from an investment function. *Id.* at 11.

The law governing the taxation of interstate commerce has become confused to the point of being indecipherable. "It would be a Herculean, if not impossible task, to review and harmonize the myriad decisions of the Supreme Court of the United States on the subject of interstate commerce and exactly what incidents thereof may be constitutionally taxed by the States. The dissenting opinions in many of those cases make clear that the task of reconciling all the decisions is more difficult than was the task of Theseus as he threaded his way through the famous Cretan Labyrinth in search of the Minotaur." *Roy Stone Transfer Corp. v. Messner*, 377 Pa. 234, 103 A.2d 700, 705 (1954). Fortunately, since 1954, the United States Supreme Court has been able to impose some order on the chaos through many of its decisions, particularly *Allied-Signal v. Director, Div. of Tax'n*, 504 U.S. 768, 119 L. Ed. 2d 533, 112 S. Ct. 2251 (1992), and its progeny.

In accordance with *Allied-Signal*, the question of whether the tax is permissible depends upon whether G.M.'s income is derived from a capital transaction that serves an operational function or an investment function. Under *Allied-Signal* and its progeny, a state is only constitutionally permitted to tax a non-domiciliary corporation on income that the corporation realizes out of state if that income is related to business conducted by the corporation within the non-domiciliary state. *Allied-Signal*, 504 U.S. 768, 788, 119 L. Ed. 2d 533, 112 S. Ct. 2251. As stated in *Allied-Signal*, "income from investment of working capital is apportionable between the states in which the business is conducted for which the working capital is held." *Id.* at 787-88. Assessments of tax by the Department are presumed *prima facie* correct. Accordingly, G.M. has the burden of proving that the income was derived from an asset that was employed in an "unrelated business activity which constitutes a discrete business enterprise." *Id.* at 773.

It is not the designation of the account but its actual use that determines whether it is serving an operational function or an investment function. *Allied-Signal*, 504 U.S. at 789. As stated in the Commonwealth's trial brief, "the tax treatment is determined by what G.M. actually did with its liquid assets, not by what it could have, should have, or would have done based on hindsight." The Department's Trial Br. at 12.

Analyzing the present case, the NYTO account in question is certainly operational in that the money is transferred from Virginia revenues to the NYTO and may be transferred back to Virginia when needed for operational expenses. Under current law, however, to determine operational function, the Court must look to whether the income generating activity was functionally

8

integrated into its business, whether there was centralization of management, and whether they achieved economies of scale through the income generating activity. *F. W. Woolworth Co. v. Taxation & Revenue Dep't*, 458 U.S. 354, 363, 73 L. Ed. 2d 819, 102 S. Ct. 3128 (1982). The fact that the investments were made for a purpose related to or contributing to the business is not alone sufficient, nor is it a proper test. *ASARCO v. Idaho Tax Comm'n*, 458 U.S. 307, 326, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982). Stated simply, the out of state activity must be related to the in state business in some concrete way that is "beyond the mere flow of funds arising out of a passive investment or a distinct business operation." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 166, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983). The stipulations and evidence prove clearly and convincingly that the NYTO account and its income served an investment function that was independent of the business G.M. conduct within this Commonwealth.

Dr. Charles de Seve testified, and the documentary evidence and stipulations supported his opinion, that, during 1990 and 1991, G.M. maintained funds in the NYTO far in excess of its cash needs. Both experts agreed that it is economically preferable for a corporation to have no working capital. From time to time, however, the corporation may have need for cash due to unexpected drops in sales or capital expenditures. G.M., however, has lines of credit that more than secure them against emergency needs. It also has a history that would support an economic approach that reduces its cash to what might be dangerously low levels for most other corporations. It is also significant that at no time during 1990 or 1991 did the amount in the account fall below $380,000, with the average daily balances approximating $1.7 million during this two-year period.

The Department argues that the account is not a discrete business but is simply a mechanism for G.M. to gain some return on its working capital as banks may not offer interest bearing accounts to corporations on demand deposits. The facts, however, lead inexorably to the conclusion that amounts in the NYTO are far in excess of any working capital needed by G.M. for its Virginia business. During the period at issue, the investments were not used as security to borrow working capital, to acquire stock or securities in other companies, or to support any bond issues. Therefore, the fact of the unavailability of interest bearing accounts to G.M. actually strengthens the argument that G.M. maintains the NYTO sweep account as a means to generate a substantial amount of revenue on excess cash on hand. The fact that

the account may be short term is a factor, but it, alone, is not determinative of the nature of the account.

Given the NYTO is a hybrid account, the question becomes whether G.M. has established an apportionment of the income in accordance with Virginia taxation law and the Constitution. While Dr. Charles de Seve used two approaches, this Court finds that the formula approach is more appropriate. This Court is persuaded by the logic and approach of the court in *Home Interiors and Gifts, Inc., v. Department of Revenue*, 318 Ill. App. 3d 205, 741 N.E.2d 998 (2000). Contrary to the Department's assertions, this is not an impermissible hindsight construct, but an analysis that determines what the appropriate working capital level would be for the years in question. This determination certainly is not to be left to the unbridled subjective choice of the taxpayer, but must be an objectively reasonable approach based upon the facts presented regarding the business of the taxpayer, taking into account, of course, the actual practices of the corporation. The Court finds Dr. de Seve's testimony and analysis credible and persuasive. Further, Dr. de Seve's determination of a fifteen-day periodicity is the proper approach. Accordingly the twenty-five percent and thirty percent ratios are proper for the respective years.

### III. *Cost of Performance*

As to the third and final issue, the Court analyzed whether the Virginia Regulation 23 VAC 10-120-250 interpretation of Virginia Code § 58.1-418 excluding costs of activities performed by unrelated third parties from the numerator and denominator of General Motors Acceptance Corporation's single apportionment factor is unreasonable or inconsistent with the Virginia Code. The relevant portion of § 58.1-418 states:

> A. The Virginia taxable income of a financial corporation, as defined herein, excluding income allocable under § 58.1-407, shall be apportioned within and without this Commonwealth in the ratio that the business within this Commonwealth is to the total business of the corporation. Business within this Commonwealth shall be based on *cost of performance in the Commonwealth* over cost of performance everywhere.

Interpreting § 58.1-418, 23 VAC 10-120-250 states that:

financial corporations do not apportion Virginia taxable income using the three factor formula but instead apportion income based solely on cost of performance. ... The "cost of performance" is the cost of all activities directly performed *by the taxpayer* for the ultimate purpose of obtaining gains or profit ... [and] such activities do not include activities performed on behalf of a taxpayer, such as those performed on its behalf by an independent contractor, [or] ... the cost of funds (interest, etc.), but does include the cost of activities required to procure loans or other financing.

Emphasis added.

G.M. argues that the Department lacks statutory authority for concluding that third-party costs should be disallowed, as the language of the statute does not specifically require the cost to be direct, only that it be a cost of performance in Virginia. G.M. Trial Br. at 17. The Department, however, contends that the Virginia Regulation is a practical interpretation of § 58.1-418 as they cannot effectively monitor third parties to determine what part of their performance, if any, occurs within Virginia. The Department's Trial Br. at 21.

Virginia Code § 58.1-205 provides that when interpreting Virginia tax laws, "(1) any assessment of a tax by the Department shall be deemed *prima facie* correct, and (2) any regulation promulgated as provided by subsection B of § 58.1-203 shall be sustained unless unreasonable or plainly inconsistent with applicable provisions of law." Va. Code Ann. § 58.1-205 (Michie 2003). There is no question that 23 VAC 10-120-250 was promulgated pursuant to § 58.1-203(B) and that it therefore comes before the Court with the presumption that it properly interprets the Code. The Court finds that a definition of Virginia Code § 58.1-418, which restricts its operation to direct costs is not "plainly inconsistent with" the language of the Code, which itself restricts costs of performance to those incurred within this Commonwealth. As the Department contends, the regulation is reasonable and necessary to the proper implementation of the "cost of performance in the Commonwealth" provision of the statute. G.M. has failed to present evidence or argument which persuades the court that the Department's position is plainly inconsistent with the law or is unreasonable.