NO. 4-96-0057

                          IN THE APPELLATE COURT

                                OF ILLINOIS

                              FOURTH DISTRICT

A.B. DICK COMPANY, as successor in      )    Appeal from

interest to A.B. DICK ACCEPTANCE        )    Circuit Court of

CORPORATION,                            )    Sangamon County

          Plaintiff-Appellant,          )    No. 93CH122

          v.                            )

SAM MCGRAW, as Acting Director of the   )

Illinois Department of Revenue, PATRICK )    

QUINN, as Treasurer of the State of     )    

Illinois and THE ILLINOIS DEPARTMENT    )    Honorable

OF REVENUE,                             )    Donald M. Cadagin,

          Defendants-Appellees.         )    Judge Presiding.

_________________________________________________________________

          JUSTICE COOK delivered the opinion of the court:

          A.B. Dick Company (A.B. Dick) and its wholly owned

subsidiaries, A.B. Dick Acceptance Corporation (Acceptance) and

Videojet Systems International (Videojet), filed separate Illi-

nois income tax returns for the tax years ending March 31, 1986,

1987, and 1988.  During audit, the companies amended their re-

turns and filed a single combined return for each year, alleging

the companies were a unitary business group within the meaning of

section 1501(a)(27) of the Illinois Income Tax Act (Tax Act) (now

35 ILCS 5/1501(a)(27) (West Supp. 1995)).  Under the amended re-

turns, the companies claim they are owed a refund of $1.2 mil-

lion.  The Department of Revenue (Department) concluded that A.B.

Dick and Acceptance were parts of a unitary business, but that

Videojet was not.  As a result of the audit the Department deter-

mined that Acceptance owed a deficiency of $2,450.  Acceptance

paid that amount under protest, and filed a verified complaint in

the circuit court of Sangamon County pursuant to the State Offi-

cers and Employees Money Disposition Act (now 30 ILCS 230/1

through 6a (West 1994)) seeking return of the tax, interest and

penalties paid under protest.  The circuit court, in a one-

paragraph docket entry, ruled in favor of the Department.  The

taxpayer appeals.  We reverse and remand.     

          It is not an easy question what part of a corporation's

income should be taxed in a particular state when that corpora-

tion does business in several states.  The question is even more

complicated when the multistate business is carried on by an

associated group of corporate entities.  See Citizens Utilities

Co. v. Department of Revenue, 111 Ill. 2d 32, 39, 488 N.E.2d 984,

986 (1986); Caterpillar Tractor Co. v. Lenckos, 84 Ill. 2d 102,

108, 417 N.E.2d 1343, 1347 (1981).  There are constitutional

limitations on the power of a state to tax income arising out of

interstate activities.  A state has the power to tax out-of-state

activities of associated corporations by formula apportionment

only when the corporations constitute a "unitary business."  Con-

tainer Corp. v. Franchise Tax Board, 463 U.S. 159, 165-67, 77 L.

Ed. 2d 545, 553-54, 103 S. Ct. 2933, 2940-41 (1983).  The ques-

tion whether there is a "unitary business" in the present case is

one of statutory interpretation, not constitutional power, but

the statute employs terms that have been defined in the constitu-

tional cases.

          The statute provides, in pertinent part:

               "The term 'unitary business group' means a 

          group of persons related through common owner-

          ship whose business activities are integrated 

          with, dependent upon and contribute to each 

          other.  ***  Unitary business activity can 

          ordinarily be illustrated where the activities 

          of the members are:  (1) in the same general 

          line (such as manufacturing, wholesaling, re-

          tailing of tangible personal property, insurance,

          transportation or finance); or (2) are steps 

          in a vertically structured enterprise or process 

          (such as the steps involved in the production of       

          natural resources, which might include explora-

          tion, mining, refining, and marketing); and, in 

          either instance, the members are functionally 

          integrated through the exercise of strong cen-

          tralized management (where, for example, 

          authority over such matters as purchasing, 

          financing, tax compliance, product line, 

          personnel, marketing and capital investment is

          not left to each member)."  35 ILCS 5/1501(a)(27)

          (West Supp. 1995).

          More than common ownership is required for a unitary

business.  The fact that a holding company owns controlling

interest in several corporations is not enough to make the group

a unitary business.  Mobil Oil Corp. v. Commissioner of Taxes,

445 U.S. 425, 440, 63 L. Ed. 2d 510, 523, 100 S. Ct. 1223, 1233 

(1980) (unitary business, however, where dividends represent

profits derived from a functionally integrated enterprise). 

There must be something "'beyond the mere flow of funds arising

out of a passive investment or a distinct business operation.'" 

Citizens Utilities, 111 Ill. 2d at 47, 488 N.E.2d at 990, quoting

Container Corp., 463 U.S. at 166, 77 L. Ed. 2d at 554, 103 S. Ct.

at 2940.  There must be more than the type of occasional over-

sight "'that any parent gives to an investment in a subsidiary.'" 

Container Corp., 463 U.S. at 180 n.19, 77 L. Ed. 2d at 563 n.19,

103 S. Ct. at 2948 n.19, quoting F.W. Woolworth Co. v. Taxation &

Revenue Department, 458 U.S. 354, 369, 73 L. Ed. 2d 819, 831, 102

S. Ct. 3128, 3138 (1982).  Section 1501(a)(27) of the Tax Act

imposes three requirements:  (1) that there be common ownership,

(2) that the companies be in the same general line of business,

and (3) that there be functional integration through the exercise

of strong centralized management.  35 ILCS 5/1501(a)(27) (West

Supp. 1995).  Only the third requirement is at issue in this

case.

          Some cases seem to indicate that "functional integra-

tion" refers to the operations of a company, and that functional

integration is a separate concept from centralized management. 

F.W. Woolworth, 458 U.S. at 364-66, 73 L. Ed. 2d at 828-29, 102

S. Ct. at 3135-36; see also Mobil, 445 U.S. at 438, 63 L. Ed. 2d

at 521, 100 S. Ct. at 1232 ("contributions to income resulting

from functional integration, centralization of management, and

economies of scale").  It seems logical that whenever there is

functional integration of operations there is also strong cen-

tralized management and vice versa.  Section 1501(a)(27) of the

Tax Act rejects the idea there are two separate tests.  If func-

tional integration has been shown, or if strong centralized

management has been shown, then there is a unitary business.    

                                     I

          A.B. Dick is a Delaware corporation with its principal

office in Niles, Illinois.  It manufactures and sells a variety

of office and business printing and duplicating equipment. 

Acceptance was a wholly owned subsidiary of A.B. Dick that

provided financing for purchasers of A.B. Dick equipment.  During

the pendency of this appeal, Acceptance was liquidated into A.B.

Dick, which succeeded to Acceptance's rights and obligations. 

Over the course of several years A.B. Dick developed a type of

noncontact printing known as ink-jet technology.  For a time,

this product line, called the "Videojet" line, was manufactured

and marketed by A.B. Dick.  On January 1, 1985, however, A.B.

Dick incorporated Videojet, a wholly owned subsidiary, to which

A.B. Dick transferred its Videojet line of assets, including

machinery, equipment, materials, supplies and inventory.  A.B.

Dick also contributed or licensed 41 patents to Videojet. 

According to A. Harris Walker, Videojet was incorporated because

it was growing and they wanted to measure its performance, they

wanted to more closely monitor what the business was doing.

          David Powell is the chairman and president of A.B.

Dick.  He is also the chairman of Videojet.  Henry J. Bode is the

vice president of A.B. Dick, and is also the president of Vid-

eojet.  Bode testified that, prior to Videojet's incorporation in

1985, he had been employed by A.B. Dick since 1972.  Video-jet's

board of directors consists of Powell and Bode.  A. Harris

Walker, general counsel of A.B. Dick, is the secretary of both

companies.  Pat Hoffman is the assistant secretary of both compa-

nies.  Kenneth Levin, the chief financial officer of A.B. Dick,

exercised control over Videojet, determining, for example, how

much Videojet cash should be transferred to A.B. Dick.  There was

testimony that both before and after incorporation Powell, Levin,

and Walker managed A.B. Dick and Videojet as if the two were a

single company.  

          Purchasing.  Videojet had a separate purchasing depart-

ment, but Videojet's purchase requests for equipment costing more

than $500 were reviewed by Levin and approved by Powell.  A.B.

Dick's general counsel had to approve all Videojet real estate

contracts and some contracts for the purchase of personal proper-

ty.       

          Financing.  All Videojet funds not immediately needed

for operations were transferred to A.B. Dick as an intercompany

loan.  Since 1986, those loans bore interest, but that interest

was never paid; instead it was treated as a dividend at year end. 

In March 1988, A.B. Dick provided financing for Videojet's acqui-

sition of the Cheshire Division of Xerox Company through a $12

million interest-free loan.  Since 1990, Videojet has occupied a

new headquarters and manufacturing facility in Wood Dale, Illi-

nois.  The lessor required A.B. Dick to sign the lease, which

obligates A.B. Dick to pay rent of $199,000 per month for five

years and escalating rent thereafter.    

          Tax compliance.  Videojet employed only one tax accoun-

tant, who had responsibility for the preparation of state tax

returns.  Videojet did not have its own tax library.  A.B. Dick

had authority to approve all federal and state tax returns filed

by Videojet.  During a 1990 audit of Videojet, the Department

dealt only with Videojet's employee, Jerome Jung.  When the

Department assessed Videojet as owing an additional $213,070,

Jung tendered a check in that amount without protest and without

seeking the approval of A.B. Dick.  A.B. Dick's chief financial

officer, Levin, testified that when Videojet was incorporated he

had pointed out that unitary tax returns should be filed.  Levin

testified that unitary returns were not filed because "[m]y tax

department blew it and I didn't concentrate on state income

taxes, quite frankly."  

          Product line.  Both A.B. Dick and Videojet are engaged

in the manufacture and sale of office and business printing and

equipment, but Videojet's activities are restricted to a line of

printing equipment utilizing ink-jet technology.  A.B. Dick and

Videojet maintained separate research and engineering depart-

ments, and did not develop any products or patents to be used by

the other.  (At least not after Videojet's incorporation.)  The

separate departments met four times a year for "corporate tech-

nology updates," although the record does not disclose what

subjects were discussed.  Videojet used some foreign patents li-

censed to it by A.B. Dick without paying any royalties.

          Personnel.  Videojet had a separate personnel depart-

ment, but A.B. Dick controls all Videojet salary levels.  A.B.

Dick approval was required to hire Videojet employees earning

more than $40,000 (10% of the Videojet workforce), and for some

terminations.  A.B. Dick approval was required for all Videojet

contracts with dealers or distributors.

          Videojet has no legal department.  All of Videojet's

legal work is done by the A.B. Dick legal department, which spent

about 30% of its time on Videojet matters.  If Videojet needed

outside counsel A.B. Dick did the hiring.  Videojet paid A.B.

Dick about $200,000 per year for legal services.  A.B. Dick pro-

vides all real estate management services to Videojet.  Vid-

eojet's Wood Dale facility was designed and contracted to be

built by the A.B. Dick real estate department.  A.B. Dick pro-

vides all insurance services to Videojet.  A.B. Dick and Videojet

were covered by the same insurance policies, for which Videojet

paid A.B. Dick $249,000 (1986), $324,000 (1987), and $350,000

(1988).  Videojet employees were part of the A.B. Dick retirement

plan.  A.B. Dick's employment benefits manager supervised that

plan, and spent about 10% of his time on Videojet matters.

          A.B. Dick's director of corporate accounting spent

about 5% of his time on Videojet matters.  A.B. Dick's tax

manager spent 5% to 8%.  A.B. Dick's chief financial officer

spent 5% to 10%.      

          Marketing.  A.B. Dick and Videojet had separate sales

and marketing departments, although Videojet's sales personnel

share offices, support facilities, secretarial and other services

with A.B. Dick sales personnel at eight A.B. Dick offices in the

United States.  A.B. Dick is reimbursed its cost for the offices. 

Videojet had two other sales offices it did not share with A.B.

Dick.  The A.B. Dick and Videojet sales departments did not

employ common marketing or advertising programs.  They did not

share a common trademark or other marketing symbol.  They did not

sell each other's products.  A.B. Dick controlled all decisions

regarding introduction of new Videojet products, and pricing of

all Videojet products.  There were no intercompany sales or

common purchasing of raw materials or supplies.  Contracts with

dealers or distributors to sell Videojet products required A.B.

Dick approval.  A.B. Dick distributors in the United Kingdom and

Canada were also Videojet's distributors.  

          Capital investment.  A.B. Dick decided how much cash

would remain in Videojet.  Before Videojet moved into the Wood

Dale facility, A.B. Dick subleased a manufacturing and office

facility located in Elk Grove, Illinois, to Videojet, at cost. 

A.B. Dick occupied a 924,000 square foot facility in Niles,

Illinois, which it leased to Videojet at cost.  Levin testified

the rent was determined the same way as when Videojet was a

division, actual cost with no profit built in.  

          The Department argues that the financial oversight that

A.B. Dick exercised over Videojet is the normal financial rela-

tionship between a parent and a subsidiary corporation.  Cf.

F.W. Woolworth, 458 U.S. at 369, 73 L. Ed. 2d at 831, 102 S. Ct.

at 3138 (type of occasional oversight "that any parent gives to

an investment in a subsidiary" (emphasis added)).  The Department

notes that Videojet charged A.B. Dick interest on the intercompa-

ny loan.  The Department would ignore the $12 million interest-

free loan to Videojet because it was made at the very end of the

tax years in question.  The Department argues that Jung's action

refutes A.B. Dick's assertion that it maintained strict oversight

of Videojet's accounting matters and tax expenditures, and argues

that potential authority over tax matters is not enough.  The

Department argues the circuit court may have made credibility

determinations adverse to A.B. Dick.  The Department also argues

that the circuit court could have rejected some testimony of A.B.

Dick officials as self-serving.  

          The Department notes there was only one transfer of

personnel between the two companies, a Videojet employee who was

transferred to A.B. Dick.  The Department concedes there were

some managerial links between the two companies, but argues there

was no proof "that these managerial links were so substantial

that they provided significant sharing of values or economies of

scale for A.B. Dick and Videojet."  The Department indicates that

Videojet paid A.B. Dick for everything it got from A.B. Dick. 

The Department argues that neither personal management style nor

subjective intent are relevant criteria for determining whether

there is centralized management.   The Department argues that

A.B. Dick and Videojet acted separately and autonomously in

marketing and selling their products, that there was no common

marketing, advertising, research or sales.  There were no inter-

company sales.  Videojet and A.B. Dick technicians are not cross-

trained to repair and maintain each other's products (except in

Canada).  The Department argues that it takes more than potential

authority over pricing decisions to show unity.       

                                    II

          The question whether a taxpayer participated in a

unitary business is a question of fact.  Citizens Utilities, 111

Ill. 2d at 47, 488 N.E.2d at 990.  In cases where the evidence is

close, where findings of fact must be determined from the credi-

bility of the witnesses, a court of review will defer to the

circuit court's factual findings unless they are against the

manifest weight of the evidence.  Kalata v. Anheuser-Busch Cos.,

144 Ill. 2d 425, 433, 581 N.E.2d 656, 660 (1991).  The evidence

here was presented through a 29-page stipulation of facts accom-

panied by exhibits, and A.B. Dick presented the testimony of

Bode, Levin, and Walker.  The Department did not present any

evidence.  We would defer to any findings of fact in this case,

but for the most part the facts are undisputed.  See Chicago

Patrolmen's Ass'n v. Department of Revenue, 171 Ill. 2d 263, 271,

664 N.E.2d 52, 56 (1996) (where facts are undisputed question is

one of law); Kroger Co. v. Department of Revenue, 284 Ill. App.

3d 473, 482, 673 N.E.2d 710, 715 (1996).  

          In the circuit court, the Department argued that cen-

tralized management requires not only the involvement of one or

more officers in the operations of all the members of the group,

but also centralized units that perform important operational

functions for all group members.  A.B. Dick suggests that argu-

ment adds something to the statutory requirement that there be

"[functional integration] through the exercise of strong central-

ized management" (35 ILCS 5/1501(a)(27) (West Supp. 1995)) and

that the Department has abandoned the argument in this court. 

The construction of a statute is a question of law to be indepen-

dently decided by the reviewing court.  Village of Glenview v.

Ramaker, 282 Ill. App. 3d 368, 370, 668 N.E.2d 106, 108 (1996).  

          There are problems where the local entity appears

profitable but the claim is made that its tax should be reduced

because of losses by other corporations in other states.  Those

losses may be difficult to verify and Illinois may be required to

depend on the cooperation of the other states, which may not

always be forthcoming.  See Moorman Manufacturing Co. v. Bair,

437 U.S. 267, 57 L. Ed. 2d 197, 98 S. Ct. 2340 (1978) (upholding

Iowa single-factor (sales) formula).  Nevertheless, combined

reporting is not an aberration; it is a necessary tool to prevent

the triumph of corporate formality over economic reality. 

Citizen's Utilities, 111 Ill. 2d at 40, 488 N.E.2d at 987. 

Combined reporting is often advantageous to the taxing body.  In

all the cases cited in this opinion, the taxing body took the

position that the business was a unitary business.  The taxing

body was successful in all those cases except F.W. Woolworth. 

Illinois has recently (effective April 25, 1996) rejoined the

multistate tax compact, as an associate member.  Neither the

Department nor the taxpayer has a choice whether combined returns

are filed.  If the business is unitary, combined reporting is re-

quired.  It is important that rules be developed to establish

what is and what is not a unitary business.  The purpose of

section 1501(a)(27) of the Tax Act, as explained in Governor

Thompson's message accompanying the amendatory veto which created

the section, was to "provide the certainty and the stability so

important to businesses, particularly those considering expanding

within or into Illinois."  III Senate Journal, 82d Ill. Gen.

Assem. (November 19, 1982), at 3756 (1982 Sess.) (Governor's

recommendations to House Bill 2588).         

                                    III

          The circuit court in the present case made the follow-

ing docket entry:

          "Section 1501(a)(27) reads that both elements

          of strong centralized management, i.e.[,] strong 

          central management authority and the exercise 

          of that authority through centralized opera-

          tions must be present in order for persons to 

          be [a] unitary business group.  The Court 

          finds that there is a lack of fundamental [sic]

          integration in the key areas of manufacturing, 

          marketing, engineering, purchasing, advertising 

          and distribution, demonstrating that there was 

          not a single unitary business in this case."

          (Emphasis added.)  

          The emphasized language comes from the Department's

regulation 100.9700(g) (86 Ill. Adm. Code §100.9700(g) (1996);

cf. regulation 100.3010(c)(1)(C) (86 Ill. Adm. Code

§100.3010(c)(1)(C) (1996)), which explains that both elements

"must exist in order to justify a conclusion that the operations

of otherwise seemingly separate trades or businesses are signifi-

cantly integrated so as to constitute a unitary business."  The

regulation does not require that "both elements" or "centralized

operations" be shown to exist in every case, only in those cases

where seemingly separate businesses are involved.  Citizens

Utilities, 111 Ill. 2d at 50-51, 488 N.E.2d at 992.  In any

event, this language was contained in the regulations before

section 1501(a)(27) of the Tax Act was enacted.  See Illinois Tax

Rep. (CCH) ¶12-416, at 1304 (1982) (regulation 300-2(c)(1)(C)). 

The failure to incorporate this language into section 1501(a)(27)

of the Tax Act, when the rest of section 1501(a)(27) was taken

from the regulation, casts doubt on the continuing validity of

the language.     

          Section 1501(a)(27) of the Tax Act gives, as an example

of strong centralized management, the situation where "authority"

over various activities "is not left to each member."  35 ILCS

5/1501(a)(27) (West Supp. 1995).  That language does not suggest

that any great deal of activity on the part of the parent is

necessary to show an exercise of authority, let alone the exer-

cise of that authority through centralized operations.  Certainly

it is not enough that authority simply exists.  Even a holding

company that has a mere "passive investment" in a subsidiary will

have ultimate authority over that subsidiary.  On the other hand,

the day-to-day management of the subsidiary need not be con-

trolled by the parent.  Citizens Utilities, 111 Ill. 2d at 48,

488 N.E.2d at 990.  What is required is that "the parent corpora-

tion enjoyed actual, centralized control" over the group.  Citi-

zens Utilities, 111 Ill. 2d at 51, 488 N.E.2d at 992.  

          There appears to be as much in the way of centralized

management in this case as there was in Citizens Utilities, where

the parent owned 24 utility subsidiaries, each of which operated

in a different state.  In Citizens Utilities, there were inter-

locking directors, the same officers (for 24 separate companies),

the parent had to approve some purchases, and the parent provided

some engineering, legal, and accounting services, at cost. 

Citizens Utilities, 111 Ill. 2d at 48, 488 N.E.2d at 990; see

also Container Corp., 463 U.S. at 166, 77 L. Ed. 2d at 554, 103

S. Ct. at 2941 (unitary principle can be applied to series of

similar enterprises operating separately but linked by common

managerial or operational resources).  

          The Department argues there has been no showing of a

significant flow of value between the two companies or the

creation of economies of scale through centralized management

functions.  We agree the flow of value must be significant, that

it must be more than de minimis, but we disagree that exact proof

of value is required.  The justification for combined reporting

is that there are "many subtle and largely unquantifiable trans-

fers of value that take place among the components of a single

enterprise."   Container Corp., 463 U.S. at 164-65, 77 L. Ed. 2d

at 553, 103 S. Ct. at 2940; Citizens Utilities, 111 Ill. 2d at

49, 488 N.E.2d at 991 (using headquarters staff to provide

services for all group members results in economies of scale). 

It would be impossible to provide exact proof of "largely unquan-

tifiable transfers of value."        

          The Department argues this case is similar to F.W.

Woolworth, where the finding of unitary business was held to

violate the due process clause.  Woolworth, a retailer, owned all

the stock of three foreign subsidiaries, also retailers, and

elected all their directors.  "It potentially has the authority

to operate these companies as integrated divisions of a single

unitary business," but mere potential was not enough when the

facts showed the subsidiaries to be discrete business enterpris-

es.  F.W. Woolworth, 458 U.S. at 362, 73 L. Ed. 2d at 826, 102 S.

Ct. at 3134.  "[N]o phase of any subsidiary's business was inte-

grated with the parent's."  (Emphasis in original.)  F.W. Wool-

worth, 458 U.S. at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135. 

Woolworth's operations were not functionally integrated with that

of its subsidiaries, and there was no centralization of manage-

ment or achievement of other economies of scale.  Each subsidiary

operated as a distinct business enterprise at the level of full-

time management, none of the subsidiaries' officers were current

or former employees of the parent, and only one officer of a

subsidiary was a participant in Woolworth's profit-sharing plan. 

F.W. Woolworth, 458 U.S. at 366 n.15, 73 L. Ed. 2d at 829 n.15,

102 S. Ct. at 3136.  Woolworth did not provide many essential

corporate services for the subsidiaries.  There was a notable

absence of any umbrella of centralized management and controlled

interaction.  F.W. Woolworth, 458 U.S. at 371, 73 L. Ed. 2d at

832, 102 S. Ct. at 3138-39.  The dissent noted there was frequent

communication between upper levels of management, major financial

decisions had to be approved by the parent, and Woolworth's

published financial reports were prepared on a consolidated

basis.  F.W. Woolworth, 458 U.S. at 373-74, 73 L. Ed. 2d at 833-

34, 102 S. Ct. at 3140 (O'Connor, J., dissenting, joined by

Blackmun and Rehnquistt, JJ.).

          In Container Corp., the parent manufactured custom-

ordered paperboard packaging, and controlled 20 foreign subsid-

iaries engaged in essentially the same business.  The parent

maintained a relatively hands-off attitude with the subsidiaries,

but held or guaranteed about half of the subsidiaries' debt,

provided advice and consultation in a number of areas, and

occasionally assisted the subsidiaries with purchases, either by

selling them used equipment or by employing its own purchasing

department to act as agent for the subsidiaries.  The Supreme

Court upheld the finding of unitary business, relying especially

on the loans and loan guarantees, and on the managerial role

played by appellant.  This was not the "'type of occasional

oversight--with respect to capital structure, major debt, and

dividends--that any parent gives to an investment in a subsid-

iary.'"  Container Corp., 463 U.S. at 180 n.19, 77 L. Ed. 2d at

563 n.19, 103 S. Ct. at 2948 n.19, quoting F.W. Woolworth, 458

U.S. at 369, 73 L. Ed. 2d at 831, 102 S. Ct. at 3138.  Instead,

the managerial role was grounded in Container Corporation's own

expertise and its overall operational strategy--"precisely the

sort of operational role we found lacking in F.W. Woolworth." 

Container Corp., 463 U.S. at 180 n.19, 77 L. Ed. 2d at 563 n.19,

103 S. Ct. at 2948 n.19.    

                                    IV

          Is Videojet a mere "passive investment," to which A.B.

Dick gives only occasional oversight, or is there functional

integration of operations and strong centralized management? 

Citizens Utilities saw it as significant that officers of the

parent were actively involved as officers of the subsidiaries. 

Citizens Utilities, 111 Ill. 2d at 51, 488 N.E.2d at 992.  We

have that in this case with Bode, Walker, and Hoffman.  F.W.

Woolworth complained that none of the subsidiary's officers were

current or former employees of the parent.  The president of

Videojet, Bode, was employed by A.B. Dick for over 10 years

before Videojet's incorporation.  Although the Department argues

there was only one transfer of personnel between the two compa-

nies, in fact all employees of Videojet at the time of its

incorporation had been employees of A.B. Dick.  There was much

more in this case than the personal management style of one or

two individuals.    

          Assuming that centralized operations are required, they

were present here.  In F.W. Woolworth, the complaint was made

that "no phase of any subsidiary's business was integrated with

the parent's."  (Emphasis in original.)  F.W. Woolworth, 458 U.S.

at 365, 73 L. Ed. 2d at 828, 102 S. Ct. at 3135.  Videojet had

some separate departments, but it had no legal department, no

real estate department, and no insurance department.  Videojet

relied on A.B. Dick for all those services.  In other areas such

as purchasing, accounting, personnel, and marketing, there was

either assistance or oversight.  F.W. Woolworth noted that only

one officer of a subsidiary was a participant in the Woolworth

profit-sharing plan.  F.W. Woolworth, 458 U.S. at 366 n.15, 73 L.

Ed. 2d at 829 n.15, 102 S. Ct. at 3136 n.15.  All Videojet

employees are part of the A.B. Dick retirement plan.  A.B. Dick

and Videojet are covered by the same insurance policies.  It is

true that Videojet reimburses A.B. Dick for its share of those

policies, and accordingly A.B. Dick cannot be considered to have

made any capital investment in Videojet through those policies,

but A.B. Dick certainly provided essential corporate services by

evaluating and obtaining the policies.  

          Container Corp. considered the parent's loans and loan

guarantees to be significant.  In the present case Videojet's

credit needs were met by A.B. Dick, which signed leases for

Videojet, subleased other property to Videojet, and financed an

acquisition by Videojet through a $12 million interest-free loan. 

The Department argues the loan was made at the end of the tax

years in question and should be ignored.  The loan does show the

relationship between the companies, however, and should be

considered in the absence of any evidence the loan was improperly

designed to evidence unitary operation.  The combined returns

were not filed until 1990, long after the loan in March 1988. 

          We find it persuasive that A.B. Dick did not acquire

Videojet from another company, but developed it from within.  It

is reasonable to presume that corporations engaged in the same

line of business are unitary.  Container Corp., 463 U.S. at 178,

77 L. Ed. 2d at 561, 103 S. Ct. at 2947.  It seems even more

likely that a corporation developed as a part of a parent's busi-

ness is not a mere passive investment but is well-equipped to

make use "of the parent's existing business-related resources." 

Container Corp., 463 U.S. at 178, 77 L. Ed. 2d at 561, 103 S. Ct.

at 2947.  

          Even assuming there were significant disputed facts

here, the circuit court's decision was clearly contrary to the

manifest weight of the evidence.  A judgment is against the

manifest weight of the evidence when an opposite conclusion is

apparent, or when the findings appear to be unreasonable, arbi-

trary, or not based upon the evidence.  Rhodes v. Illinois

Central Gulf R.R., 172 Ill. 2d 213, 242, 665 N.E.2d 1260, 1274

(1996).  Accordingly, we reverse the decision of the circuit

court and remand with instructions that the circuit court enter

an order granting the relief sought.

          Reversed and remanded.                                 

          GARMAN, J., concurs.

          McCULLOUGH, J., dissents. 

     JUSTICE McCULLOUGH, dissenting:

     I respectfully disagree with the decision of the majority.

     As the majority states, section 1501(a)(27) of the Tax Act

sets forth three requirements for determination of a unitary

business and only the element of functional integration through

the exercise of strong centralized management is at issue.

     The circuit court found that there was "a lack of fundamen-

tal integration in the key areas of manufacturing, marketing,

engineering, purchasing, advertising and distribution."

     The majority agrees that there were significant disputed

facts.  The circuit court's decision was not clearly contrary to

the manifest weight of the evidence.