**Fred TURNER and Melissa Turner, Appellants–Plaintiffs,**

v.

**RICHMOND POWER AND LIGHT COMPANY, Appellee– Defendant.**

**No. 89A01–0002–CV–67.**

Court of Appeals of Indiana.

Oct. 5, 2001.

William F. Conour, Conour Doehrman, Indianapolis, IN, Attorney for Appellant.

Miriam A. Rich, St. Paul Staff Counsel Office, Indianapolis, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

Fred Turner[1] appeals the trial court's Indiana Trial Rule 12(B)(1) dismissal of his negligence action against Richmond Power and Light Company ("RPL"). We reverse.

### Issue[2]

Turner raises the following consolidated and restated issue for our review: whether Turner's negligence action against RPL is barred by the exclusive remedy provision of the Worker's Compensation Act (the "Act").

### Facts and Procedural History

The facts reveal that Turner was employed as a crew supervisor for the Richmond Sanitary District, a department of the City of Richmond (the "City"). On September 24, 1998, Turner and his crew were installing a sewer line. While excavating the sewer line, a co-employee hit a buried power line that resulted in Turner being electrocuted. Subsequently, Turner received worker's compensation benefits from the City.

On January 26, 1999, Turner filed suit in the Wayne County Superior Court against RPL alleging that the utility negligently marked the location of the underground power line. On March 26, 1999, RPL filed with the trial court a Trial Rule 12(B)(1)

motion to dismiss Turner's complaint. RPL alleged in its motion to dismiss that Turner's negligence action against RPL was barred by the exclusive remedy provision of the Act. On January 26, 2000, the trial court dismissed Turner's complaint for lack of subject matter jurisdiction. This appeal ensued.

### Discussion and Decision

Turner contends that the trial court erred in dismissing his complaint against RPL for lack of subject matter jurisdiction because his negligence action against the utility is not barred by the exclusivity provision of the Act. We agree.

### I. Standard of Review

When an employer defends against an employee's negligence claim on the basis that the employee's exclusive remedy is to pursue a claim for benefits under the Indiana Worker's Compensation Act, the defense is properly advanced through a motion to dismiss for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1). *Foshee v. Shoney's, Inc.*, 637 N.E.2d 1277, 1280 (Ind.1994). In ruling on a motion to dismiss for lack of subject matter jurisdiction, the trial court may consider not only the complaint and motion, but also any affidavits or evidence submitted in support. *Indiana Dep't of Highways v. Dixon*, 541 N.E.2d 877, 884 (Ind.1989). In addition, the trial court may weigh the evidence to determine the existence of the requisite jurisdictional facts. *Borgman v. State Farm Ins. Co.*, 713 N.E.2d 851, 854 (Ind.Ct.App.1999), *trans. denied.*

---

1. We note that his wife, Melissa Turner, was also named as a plaintiff in the January 26, 1999, complaint against RPL. Under count II of the complaint, Melissa alleges that "[a]s a result of the negligence of defendant RP & L, she has suffered a diminishment and loss of her husband's love, care, affection, and services." R. 9. For the sake of brevity, we have only referred to Turner's claim against RPL.

2. We heard oral argument at Franklin College on December 7, 2000. We gratefully acknowledge the hospitality of the students, faculty, and administration of the College and the capable advocacy of the parties' counsel.

■ The standard of appellate review of a trial court's grant or denial of a motion to dismiss pursuant to Trial Rule 12(B)(1) is a function of what occurred in the trial court. *GKN Co. v. Magness,* 744 N.E.2d 397, 401 (Ind.2001). The standard of appellate review is dependent upon: (i) whether the trial court resolved disputed facts; and (ii) if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a "paper record." *Id.* If the facts before the trial court are not in dispute, then the question of subject matter jurisdiction is purely one of law and no deference is afforded to the trial court's conclusion. *Id.* The standard of review is de novo. *Id.*

■ If the facts before the trial court are in dispute, then appellate review focuses on whether the trial court conducted an evidentiary hearing. *Id.* Under these circumstances, a court typically engages in its classic fact-finding function, often evaluating the character and credibility of witnesses. *Id.; Anthem Ins. Cos., Inc. v. Tenet Healthcare Corp.,* 730 N.E.2d 1227, 1238 (Ind.2000). Where the trial court conducts an evidentiary hearing, we give its factual findings and judgment deference. *Menard Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000). In reviewing a trial court's findings of facts and judgment, we will reverse only if they are clearly erroneous. *Magness,* 744 N.E.2d at 401. Where the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded to the trial court's factual findings or judgment because under those circumstances, a court of review is "in as good a position as a trial court to determine whether the trial court has subject matter jurisdiction." *MHC Surgical Ctr. Assocs., Inc. v. State Office of Medicaid Policy & Planning,* 699 N.E.2d 306, 308 (Ind.Ct.App.1998).

■ Here, several facts before the trial court were in dispute, and even for those facts not in dispute, the parties disagree about the inferences to be drawn from those undisputed facts. In addition, it appears from the record that the trial court did not conduct an evidentiary hearing. Rather, it ruled on a paper record consisting of: (1) the parties' complaints; (2) affidavits of witnesses; (3) deposition testimony; and (4) memorandum. Accordingly, our standard of review is de novo; we will affirm the judgment of the trial court on any legal theory the evidence of record supports. *See Magness,* 744 N.E.2d at 401. However, the ruling of the trial court is presumptively correct, and we will reverse on the basis of an incorrect factual finding only if Turner persuades this court that the balance of the evidence is tipped against the court's findings. *Id.*

## II. The Act

■ The Act provides compensation for employees who suffer injuries which arise out of and in the course of their employment. *Construction Mgmt. & Design, Inc. v. Vanderweele,* 660 N.E.2d 1046, 1049 (Ind.Ct.App.1996), *trans. denied.* Worker's compensation obviates the uncertainty, delay, and expense of common law remedies by substituting a fixed compensation according to reimbursement schedules. *Baker v. Westinghouse Elec. Corp.,* 637 N.E.2d 1271, 1274 (Ind.1994). The remedies provided in the Act are in derogation of the common law, and a statute that is in derogation of common law must be strictly construed against limitations on a claimant's right to bring suit. *McQuade v. Draw Tite, Inc.,* 659 N.E.2d 1016, 1018 (Ind.1995). Prior to the Act, an employee's only remedy was an action in tort against the employer which was rarely successful. *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425, 427

(Ind.1973). Worker's compensation is for the benefit of the employee and the Act must be strictly construed in favor of the employee so as not to negate the Act's humane purposes. *Id.*

### A. Exclusive Remedy

The right of an injured employee to bring a legal claim against his or her employer is governed by Indiana Code section 22–3–2–6, which provides that the benefits under the Act constitute the exclusive remedy to the employee against the employer:

> The rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 5–2–6.1.

This statute limits an employee whose injury meets the jurisdictional requirements of the Act to the rights and remedies provided therein. *Campbell v. Eckman/Freeman & Assoc.*, 670 N.E.2d 925, 929 (Ind.Ct.App.1996), *trans. denied.* Thus, if an employee's injury occurred by an accident which arose out of and in the course of his employment, that individual is entitled to worker's compensation benefits, and the exclusivity provisions bar a court from hearing any common-law action brought by the employee for the same injuries. *Id.*

However, the Act permits an injured employee to pursue a legal claim against any "other person than the employer":

> Whenever an injury or death, for which compensation is payable under chapters 2 through 6 of this article shall have been sustained under circumstances creating in some other person than the employer and not in the same employ a legal liability to pay damages in respect thereto, the injured employee, or his dependents in case of death, may commence legal proceedings against the other person to recover damages notwithstanding the employer's or the employer's compensation insurance carrier's payment of or liability to pay compensation under chapters 2 through 6 of this article.

Ind.Code § 22–3–2–13. This statute permits a worker's compensation claimant to bring a legal action against a third party tortfeasor so long as: (1) the civil action does not create a legal liability on the employer to pay damages; and (2) the third party defendant is not "in the same employ" as the injured employee. *State v. Coffman,* 446 N.E.2d 611, 613 (Ind.Ct.App. 1983).

Indiana Code section 22–3–6–1 defines "employer" and "employee" as follows:

> (a) "Employer" includes the state and any political subdivision, any municipal corporation within the State, any individual or the legal representative of a deceased individual, firm, association, limited liability company, or corporation or the receiver or trustee of the same, using the services of another for pay. A parent or a subsidiary of a corporation or a lessor of employees shall be considered to be the employer of the corporation's, the lessee's, or the lessor's employees for purposes of IC 22–3–2–6. If the employer is insured, the term includes the employer's insurer so far as applicable. However, the inclusion of an employer's insurer within this definition does not allow an employer's insurer to avoid payment for services rendered to an employee with the approval of the employer. The term also includes an employer that provides on-the-job train-

ing under the federal School to Work Opportunities Act (20 U.S.C. 6101 et. seq.) to the extent set forth in IC 22–3–2–2.5.

(b) "Employee" means every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation, or profession of the employer.

There is no dispute that Turner is an employee of the Sanitary District, a governmental agency of the City. In addition, the parties are in agreement that the Sanitary District and the City are the same governmental entity, an entity from which Turner has received worker's compensation benefits. However, the parties are in dispute over whether RPL and the City are separate and distinct entities under the Act.

### B.   Allowance of Third Party Actions

#### 1.   State/Governmental Agency

Turner contends that he may assert a third party action against RPL because he does not have an employment relationship with the utility company. RPL characterizes the relationship between it and the City as analogous to the relationship between different branches of the same governmental entity. RPL argues that this case is controlled by our prior decisions in *State v. Coffman*, 446 N.E.2d 611 (Ind.Ct. App.1983), and *Indiana State Highway Dept. v. Robertson*, 482 N.E.2d 495 (Ind. Ct.App.1985).

In *Coffman*, a driver of a State Highway Department truck was involved in a collision with a State Police officer. 446 N.E.2d at 612. Both the truck driver and the police officer were acting in the course and scope of their employment at the time of the accident. *Id.* Thereafter, the truck driver received worker's compensation benefits from the State and then brought a tort action against the State. *Id.* The State's motion for summary judgment was denied by the trial court, and we reversed. *Id.* at 612–13.

The truck driver asserted that he and the police officer were not in the "same employ," relying on our statement in *Ward v. Tillman*, 179 Ind.App. 626, 386 N.E.2d 1003, 1005–06 (1979), that the "test to determine whether Ward and Tillman were 'in the same employ' is whether or not the denominated defendant, Tillman, could obtain compensation benefits in the same or similar circumstance." The truck driver argued that the police officer could not be his co-employee because the State Police were covered under their own disability fund, and not under worker's compensation. *Coffman*, 446 N.E.2d at 614.

This court did not address this test, and instead noted that the Act provided that an injured employee could not sue another person if the action would create a legal liability in the employer to pay damages. Ind.Code § 22–3–2–13. The Indiana Tort Claims Act provided that a governmental entity would pay any judgment or settlement against an employee when the act causing the loss was within the scope of his employment. Ind.Code § 34–4–16.5 (now Ind.Code § 34–13–3–5(c)(1)). We concluded that truck driver's sole remedy was under the Act because a judgment against the police officer would create a legal liability in the State to pay damages. *Coffman*, 446 N.E.2d at 614.

In *Robertson*, an employee of the State Department of Mental Health was performing job-related duties when she was involved in a collision on a state highway. 482 N.E.2d at 496. She collected worker's compensation benefits, but also sued the State Highway Department for the negli-

gent design, construction, and maintenance of the intersection. *Id.* The state employee did not allege that the Highway Department and the Department of Health were different entities under the Act, and we did not address this question. Rather, she argued that the State was subject to suit under a "dual capacity" theory. *Id.* at 498. We noted that we had repeatedly rejected the "dual capacity" theory, and held that the state employee's exclusive remedy was under the Act. *Id.* at 499. Accordingly, we reversed the denial of the State's summary judgment motion. *Id.*

Based upon the facts and circumstances of the present case, we do not find these cases instructive. RPL is not a "pure" government agency like the State police in *Coffman* or the State Highway Department in *Robertson.* Therefore, for guidance we look to our opinion in *Seaton–SSK Engineering v. Forbes,* 639 N.E.2d 1048 (Ind.Ct.App.1994), and our supreme court's opinion in *McQuade v. Draw Tite, Inc.,* 659 N.E.2d 1016 (Ind.1995).

### 2. Parent Corporation/Subsidiary

In *Forbes,* the plaintiff was an employee of Permanent Mold, a wholly-owned subsidiary of CMI–International. 639 N.E.2d at 1048. The plaintiff was injured while operating a machine manufactured by Seaton, also a wholly-owned subsidiary of CMI. The plaintiff received worker's compensation benefits through Permanent Mold, and later sued CMI and Seaton. *Id.* The trial court denied CMI and Seaton's motion for summary judgment, and we affirmed. *Id.*

We applied an "economic reality" test to determine whether CMI and Seaton were, along with Permanent Mold, the plaintiff's "employer." *Id.* at 1050. This test involves a consideration of the "totality of the circumstances surrounding the work performed." *Id.* Relevant factors include: control of the worker's duties, payment of wages or benefits, the right to hire, fire, and discipline, and performance of duties as an integral part of the employer's business. *Id.* We found this test consistent with public policy: "[i]nasmuch as employers are insulated from full responsibility from employment-related injury, it is equitable to confer such insulation only where an employment relationship actually existed between the parties." *Id.*

After analyzing the facts and circumstances, we found that the two subsidiaries had two of three directors in common; CMI had about twenty subsidiaries in various states; the subsidiaries filed a consolidated tax return; day-to-day operations were handled by individual plant supervisors; each subsidiary had a payroll account funded by the parent; the subsidiaries had a joint profit-sharing plan; Seaton made equipment for foundries, while Permanent Mold made castings for the automotive industry; some subsidiaries were unionized and some were not; and the subsidiaries were "self-insured" for worker's compensation. *Id.* at 1051. While the basic details of the operations were not disputed, we concluded that "the factfinder must determine whether the employees of one subsidiary are subject to the degree of control by the parent or a sister subsidiary characteristic of an 'employment' relationship." *Id.*

The Indiana Supreme Court in *McQuade* reached a similar result as our decision in *Forbes,* when it reversed summary judgment for the employer's parent corporation even though the parent corporation controlled the employer's operations, shared a worker's compensation policy with the employer, and performed payroll and accounting functions for the employer. 659 N.E.2d at 1019. The court noted that business owners "may take advantage of the benefits of dividing the business into separate corporate parts,

but principles or [sic] reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee." *Id.* at 1020 (quoting *Boggs v. Blue Diamond Coal Co.,* 590 F.2d 655, 662 (6th Cir.1979)). Accordingly, our supreme court held that the exclusivity provision of the Act does not prevent an employee from suing his or her employer's parent corporation when there is an alleged breach of duty separate and distinct from any vicarious liability attributable to the parent for acts of its subsidiary. *McQuade,* 659 N.E.2d at 1019. "What our decision is meant to prevent is a situation where an injured party would be deprived of his or her day in court by the purely fortuitous circumstance that the alleged tortfeasor is the corporate parent of the injured party's employer." *Id.* at 1019 n. 4.

### 3. Hybrid Entity

RPL retains aspects that indicate that it is an agency or department of the City, and other aspects which indicate that it is a separate and distinct entity from the municipality. Because of the hybrid nature of RPL, the electric company cannot be neatly "pigeonholed" as a governmental agency or as a separate and distinct entity from the City. Therefore, we must analyze the overall structure of RPL and its relationship to the City to determine whether Turner may assert a third party action against the utility.

There are several factors that indicate that RPL is an agency of the City. The City in 1914, bought the privately owned electric company, now known as RPL, for the purpose of providing adequate, low cost, dependable service to the residents of the municipality. Since 1914, RPL has become the largest municipally owned electric company in Indiana. RPL is not a privately owned corporation, rather it is wholly owned by the City. Also, the City owns the land upon which the utility resides. These two indicators provide strong evidence that RPL is a department of the City.

In addition, the composition of the board of directors of the utility provides evidence of its affiliation with the City. The board of directors of RPL consists of nine members, with one member as chairperson and one as vice chairperson. It appears that in the early 1920's, the board of directors of RPL were appointed by the mayor of the City. When a scandal erupted concerning kickbacks in coal purchase, the decision was made to place the members of the City Council on the board of directors of the utility. Currently, RPL's board of directors consists entirely of the members of the City Council. The chairman of RPL's board of directors is the president of the City Council. Typically, the board of directors of the utility meets twice a month, and these meetings precede the City Council meetings. Thus, the elected members of the legislative branch of the City sit as the board of directors of RPL. The City's practice conforms with Indiana Code section 8–1.5–3–3 [3] which provides that:

---

**3.** Indiana Code section 8–1.5–3–4 outlines the powers and duties of the board of directors of a utility. This statutory provision provides in pertinent part that:

(a) The board has general supervisory powers over the utilities under its control, with responsibility for the detailed supervision of each utility to be vested in its superintendent, who is responsible to the board for the business and technical operation of the utility. The board shall:

(1) fix the number and compensation of employees;

(2) adopt rules governing the appointment of employees including making proper classifications and rules to:

(A) determine the eligibility of applicants;

(a) The legislative body of a municipality may, by ordinance, provide for the control of any or all of its municipality owned utilities by:

* * *

(2) a board consisting of the members of the municipal legislative body. . . .

RPL is tied to the municipality by the fact that members of the City's legislative branch also sit as the board of directors of RPL.

Moreover, there are other indicators that support the conclusion that RPL is integrated with the City. RPL employee

(B) determine by competitive examination the relative fitness of the applicants for positions;
(C) establish eligible lists arranged according to the ratings secured;
(D) provide for the appointment of those have the highest ratings; and
(E) provide for the promotion of employees;
(3) subject to IC 36–4–9–2, appoint a superintendent or manager of each utility under its control who is responsible to the board for the business and technical operation of the utility; the board shall make the appointment on the basis of fitness to manage the particular utility to which he is to be assigned, taking into account his executive ability and his knowledge of the utility industry;
(4) subject to IC 36–4–9–12, hire attorneys when required for operation of the utility;
(5) hire professional or expert personnel when required for the operation of the utility;
(6) submit a budget of its financial needs for the next year in the detail required by the municipal legislative body;
(7) recommend to the legislative body reasonable and just rates and charges for services to the patrons of each utility;
(8) appropriate, lease, rent, purchase, and hold all real and personal property of the utility;
(9) enter upon lands for the purpose of surveying or examining the land to determine the location of any plant or appurtenances;
(10) award contracts for:

paychecks are issued by the City. The City Controller issues and signs all checks on behalf of the utility. RPL funds may not be released without approval from the City Controller. In addition, the City and RPL participate in the same worker's compensation plan. Turner received his worker's compensation benefits from Employer Security Insurance Company pursuant to a policy of insurance issued to the City contest the fact that RPL retains certain characteristics of a municipal department. However, there also exist notable aspects of RPL that unerringly lead us to the

(A) the purchase of capital equipment;
(B) the construction of capital improvements;
(C) other property or purposes that are necessary for the full and efficient construction, management, and operation of each utility;
(11) adopt rules for the safe, economical, and efficient management and protection of each utility;
(12) deposit at least weekly with the municipal fiscal officer all money collected from each utility to be kept in a separate fund subject to the order of the board; and
(13) make monthly reports to the fiscal officer of the receipts and disbursements of money belonging to each utility and an annual report of the condition of the utility.

(b) The board may purchase by contract electricity, water, gas, power, or any other commodity or service for the purpose of furnishing the commodity or service to the patrons of the municipally owned utility or to the municipality itself.

(c) If the board wants to purchase the commodity or service from a public utility and the parties cannot agree on a rate or charge to be paid for it, either party may apply to the commission or other appropriate state or federal regulatory agency to establish a fair and reasonable rate or charge to be paid for the commodity or service.

(d) The board may discontinue water service by a waterworks to:
(1) a water consumer; or
(2) any property. . . .

conclusion that RPL operates as a separate and distinct entity from the City. For example, RPL is not included in the City's organizational chart, which contains departments of the City such as sanitation, fire, police, finance, engineering, parks, planning, and the city attorney. RPL argues that the utility is part of the department of administration, but there is no evidence to support such a contention.

Further, the record supports the conclusion that the City does not play a part in RPL's personnel matters. RPL does its own hiring of employees, while employees of departments of the City are hired through human resources. There is also no exchange of personnel between RPL and the City, and new RPL employees do not participate in any "training program" promulgated by the City. Further, the termination of general RPL employees is done internally; the City does not participate in such employment decisions. Essentially, RPL trains and manages its own employees.

In addition, RPL and the City generally have different benefits for their employees. Although RPL and City department employees share the same worker's compensation carrier, RPL employees have separate health insurance and pension plans. In addition, the utility reimburses its employees for education expenses apart from the municipality. We also note that RPL executives are provided with personal cars and related expenses that are paid for by RPL. Thus, RPL's benefit package is not analogous with the City's benefit package for department employees.

Moreover, the method upon which RPL enters into service contracts with its customers, bills, and collects payment indicates that the utility is independent from the City. RPL contracts directly with customers for providing electric service. Further, the City, along with residential and commercial customers, is billed for its electric consumption. The City compensates RPL for all electricity it consumes in a given time period. For all intents and purposes, the City is just another customer of the utility. RPL directly receives payment from its customers, payment which is placed in RPL bank accounts.

There exist other factors which indicate the utility acts as if it is not affiliated with the City. The utility and the City maintain separate accounts. RPL has its own payable and receivable accounts. In addition, the utility maintains its own investment accounts apart from the City's investment accounts. Further, the utility owns all of its equipment and facilities that are essential for the delivery of electric service. For example, the utility owns maintenance vehicles, power stations, sub stations, service buildings, electric meters, and administration buildings. Although the City may have purchased RPL in 1914, it appears that since the date of purchase the utility company has claimed sole ownership of the means for delivering electric service. The record indicates that the City is not listed as the entity retaining title to such property.

In addition, RPL maintains its own budget and retains its own finance officer. RPL specifically designates in its budget the amount needed for salaries, equipment, advertising, and other operating and business expenses. Although the City Controller issues the checks, it appears that the City does not have the discretion to raid the coffers of RPL. To the contrary, the City Controller must abide by the instructions and direction of RPL finance personnel. It is true that RPL money is in a joint account with City money, which is all managed by the City Controller. But RPL is apprised of the exact amount of its funds in the account. The City Controller's authority with regard to RPL

funds is ministerial, not discretionary. Moreover, the City departments are funded via tax dollars, whereas RPL is a self-sustaining utility that receives no tax money. Besides the release of funds, it appears that budgetary matters differ between RPL and the City.

Also, RPL utilizes the services of the City attorney, but these expenses are allocated in RPL's budget. In addition, it appears that RPL regularly retains private counsel to handle its business affairs, such as providing assistance in effecting rate changes. The record supports the conclusion that RPL has its own outside counsel. Moreover, the utility maintains its own liability insurance. Thus, it appears that RPL conducts its legal matters and maintains insurance coverage separate and distinct from the City.

The hierarchy of management of RPL differs from that of other City departments. Unlike the City departments, the mayor does not appoint top management of the utility. The board of directors are duly elected by the citizens of Richmond. In turn, the board hires the general manager, the individual who runs the day-to-day operations of the utility. It appears from the record that the general manager guides and directs the operation of the utility without any significant influence from the City.

■ Applying the "economic reality" test, it appears that RPL is more akin to a subsidiary of a municipal corporation than a governmental agency. *See Forbes,* 639 N.E.2d at 1050. There is little "functional integration;" RPL operates essentially in a vacuum apart from the rest of the City's departments. *See, e.g., F.W. Woolworth Co. v. Taxation & Revenue Dept. of State of N.M.,* 458 U.S. 354, 364, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982). We believe that RPL operates as a "discrete business enterprise" from the City. *See Id.* at 367, 102 S.Ct. 3128. There is no exchange of personnel and the hiring, training, and firing process of RPL is independent from the City. Although there exist some managerial links, these are not sufficient to insulate RPL from a third party action by Turner. Further, RPL possesses autonomy to determine its own policies, programs, and directives regarding the delivery of electric service. The utility further has sole ownership of the means of delivering electric service. In addition, RPL develops its own budget, maintains separate investment and banking accounts, liability insurance, and conducts its legal affairs apart from the City.

Based upon these facts and circumstances, we believe RPL is a separate and distinct entity from the City. Thus, Turner's negligence action against the utility is not barred by the exclusivity provision of the Act. The trial court erred in dismissing Turner's suit under Trial Rule 12(B)(1).

Our determination that RPL is a separate and distinct entity from the City comports with the Indiana Supreme Court's decision in *Buckley v. Standard Inv. Co.,* 581 N.E.2d 920 (Ind.1991). In *Buckley,* the plaintiff brought a negligence action against Citizens Gas and Coke Utility ("Citizens"). *Id.* at 921. Thereafter, Citizens filed a summary judgment motion with the court arguing that it was entitled to immunity under the Indiana Tort Claims Act. *Id.* The trial court determined that Citizens was a political subdivision of the State, and we affirmed. *Id.*

We noted that a "political subdivision" was defined to include a "city" and a "board or commission" of a city under Indiana Code section 34–4–16.5–2(2),[4] and

---

4. Currently Ind.Code § 34–6–2–110.

determined Citizens was within that definition because it was controlled by the Board of Directors for Utilities. *Id.* Citizens was operated under the authority of Indiana Code section 8–1–11.1–1(a), which creates as an executive department of a consolidated city a department of public utilities which is to be governed by the Board. *Id.* The Board is in turn appointed by a Board of Trustees for Utilities, which board is created by the same statute. *Id.*

Our supreme court found "this tenuous statutory connection between the city and the operations of Citizens is not the type of relationship required to entitle Citizens to the benefits of immunity from tort liability." *Id.* The court noted that the Board was not made answerable to the city through the statute, and that the connection between the Board and the city was "slight and does not involve control over the actions or the makeup of the board." *Id.* at 922. Thus, "the statutory scheme under which Citizens is operated does not create a governmental entity. The legislature cannot simply mention an existing, independent Board of Trustees in a statute which allows them to maintain the independence and thereby make them a department of the city."[5] *Id.* Accordingly, the Indiana Supreme Court held that Citizens was not a political subdivision of the City of Indianapolis entitled to immunity under the Indiana Tort Claims Act. *Id.*

Our view that RPL is not an agency or department of the City is also consistent with the ideals expressed in Article One, section 12 of the Constitution of Indiana:

All courts shall be open; and every person, for injury done to him and his person, property or reputation, shall have remedy by due course of law. Justice shall be administered freely without purchase; completely, and without denial; speedily without delay.

Accordingly, we reverse the trial court's dismissal of Turner's negligence action against the City.

### Conclusion

Based on the foregoing, we hold that the trial court's Trial Rule 12(B)(1) dismissal of Turner's negligence action against RPL constitutes reversible error.

Reversed.

RILEY, J., concurs.

MATTINGLY–MAY, J., dissents with opinion.

MATTINGLY–MAY, Judge, dissenting with opinion.

I believe the City and RPL are, for purposes of worker's compensation coverage, the same entity. For that reason, Turner's negligence action against the City was barred by the Act and was properly dismissed by the trial court. I must therefore respectfully dissent.

RPL is an electric utility owned by the City. Its employees' paychecks are issued by the city controller. The City owns the real estate RPL uses, and RPL and City departments and agencies share equipment. RPL is governed by a board that is made up of the same persons who serve on the Richmond City Council. Its employees' paychecks are issued by the City, and the City and RPL participate in the same

---

5. On rehearing, the *Buckley* court clarified a misstatement concerning the statutory provision for the initial appointment of the board members. *Buckley v. Standard Inv. Co.,* 586 N.E.2d 843, (Ind.1992). However, the court reaffirmed its holding: "the Board of Trustees is an independent, self-perpetuating body with a tenuous statutory relationship to city government that involves no control over the actions or current makeup of the Board by the city of Indianapolis." *Id.*

worker's compensation plan. RPL utilizes the services of the Richmond city attorney.[6]

I believe the majority's reliance on *McQuade* and *Forbes* is misplaced, and that it is inappropriate to treat the City and RPL as a parent corporation and subsidiary.[7] Implicit in *Forbes* and explicit in *McQuade*, 659 N.E.2d at 1020, is the well-recognized principle that an entity cannot organize itself and its subsidiaries so as to take advantage of the division into separate corporate parts, but then later disavow the separate corporate identities when sued by an injured employee. Because that policy concern is not so clearly implicated by the structuring of local government into separate divisions, I would decline Turner's invitation to treat RPL as a "corporate subsidiary" of the City. Rather, I believe the relationship between RPL and the City is analogous to the relationship between different branches of the same governmental unit.

6. In determining RPL is a separate entity from the City, the majority notes that "it appears that RPL regularly retains private counsel to handle its business affairs ... [t]he record supports the conclusion that RPL has its own outside counsel ... [t]hus, it appears that RPL conducts its legal matters ... separate and distinct from the City." Op. at 557–58. I do not read the record as supporting this characterization of that aspect of RPL's relationship with the City.

Turner asserts in his Statement of the Facts that "RPL has the power to sue and be sued in its own name, has private counsel on retainer, and in fact has sued in its own name and has hired outside counsel in each case, rather than use the CITY'S counsel." (Br. of Appellant at 4.) The record reference Turner offers does not directly support that statement. It reflects the following exchange between Turner's counsel and RPL's chief operating officer:

Q. Do you know of any time RP & L has filed a lawsuit against anybody?
A. I believe it has happened. It was before my time so I wasn't involved in it. I think the, maybe even five, eight years ago had to go to lawsuit, but it was before my time. I don't know how it's done.
Q. And that suit was brought on behalf of RPL directly, right?
A. I wasn't involved with it, I don't know.
Q. Is that your understanding, it was RP & L that brought suit?
A. Yes.
Q. Does RP & L have attorneys on staff?
A. I would consider the city attorney an attorney on staff. We pay for part of his wages and I call him up quite frequently and use them—
Q. The only counsel—

A. —but they would be the only consider staff.
Q. Do you have attorneys that you retain as independent law firms?
A. Yes.
Q. Are there some that are on a constant retainer?
A. Not what I would consider the true definition of retainer, no. We use them constantly, we pay for their services, but we don't pay a separate retaining fee.
Q. You just pay an hourly rate?
A. Hourly rate, correct.
Q. But you're using them all the time?
A. Yes.
Q. Those are just local Richmond firms or Indianapolis firms?
A. Indianapolis and at times Washington, D.C.
Q. And those are paid for by RP & L?
A. Yes.
Q. Is that, are you the one that hires the lawyers?
A. I'm the one that recommends hiring them but the city attorney has the, I guess final authority on whether or not he approves hiring them or not.
Q. Does he ever not follow your recommendation?
A. Not since I've been on board, no.
(R. at 148.)

7. Turner asserts in his argument, though not in his Statement of the Facts, that RPL is "a separate and distinct profit-driven corporation," (Br. of Appellant at 10) and that "the CITY and RPL are effectively separate corporate entities." (*Id.* at 15.) Turner directs us to no evidence in the record indicating the City and RPL have separate corporate structures, and my review of the record reveals none.

I further disagree with the majority's assertion that its result comports with *Buckley v. Standard Investment Co.* There, our supreme court determined Citizen's Gas & Coke utility was not a political subdivision of the City of Indianapolis entitled to Tort Claims Act immunity. The majority recites the *Buckley* court's holding that the "tenuous statutory connection between the city and the operations of Citizens is not the type of relationship required to entitle Citizens to the benefits of immunity from tort liability." 581 N.E.2d at 921. The *Buckley* court noted that the Board was not made answerable to the city through the statute, and that the connection between the Board and the city was "slight and does not involve control over the actions or the makeup of the board." *Id.* at 922. Thus, "the statutory scheme under which Citizens is operated does not create a governmental entity. The legislature cannot simply mention an existing, independent Board of Trustees in a statute which allows them to maintain that independence and thereby make them a department of a city." *Id.*

The relationship between RPL and the City of Richmond is not so "tenuous" as that of Citizens and the City of Indianapolis, and I believe the majority's analysis is therefore inconsistent with that of *Buckley*. RPL, like Citizens, does operate under a "statutory scheme." However, that is the extent of the similarity between the status of RPL and that of Citizens.

As the majority suggests, RPL is presumably governed by Ind.Code chapter 8–1.5–3, which applies to all municipalities (other than consolidated cities) that own or operate utilities. That chapter, like chapter 8–1–11.1 that authorized the operation of Citizens, allows for governance of the utility by a board. However, Ind.Code § 8–1.5–3–3(a)(2) provides that the board may be composed of the members of the municipal legislative body, and the RPL board is, in fact, made up of the same individuals who compose the Richmond City Council. As such, it cannot be said that the City does not control the RPL board or that the board is not answerable to the City. To the extent the *Buckley* case was premised on that lack of connection or control, *Buckley* does not support the argument that RPL is not a "government entity."

Because the City and RPL are more properly characterized as different branches of the same governmental unit, I believe Turner was "in the same employ" when he was injured as were the employees of RPL. The trial court therefore properly determined it lacked subject matter jurisdiction to hear Turner's action, and I would affirm its dismissal of the lawsuit.